United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 15, 2004**

Charles R. Fulbruge III
Clerk

In the

# United States Court of Appeals
## for the Fifth Circuit

─────────────

m 04-20001

─────────────

MARK NEWBY, ET AL.,

Plaintiffs,

MARK NEWBY; THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,

Plaintiffs-Appellees,

VERSUS

ENRON CORPORATION, ET AL.,

Defendants,

ANDERSEN-UNITED KINGDOM; ANDERSEN-BRAZIL;
ARTHUR ANDERSEN & COMPANY INDIA; ANDERSEN WORLDWIDE SC,

Defendants-Appellees,

VERSUS

RINIS TRAVEL SERVICE INC. PROFIT SHARING TRUST UA 6-1-1989;
MICHAEL J. RINIS, IRRA,

Intervenor Plaintiffs-Appellants,

SETTLEMENT CLASS MEMBERS; JAMES H. ALLEN, JR.; BURTON W. CARLSON, JR.;
MICHAEL T. DEFREECE; MARCIA A. DEFREECE; ANDREW E. KRINOCK;
PHYLLIS A. KRINOCK; PARTCOM LIMITED PARTNERSHIP;
REED PARTNERS LP,
FORMERLY KNOWN AS REED FAMILY LIMITED PARTNERSHIP;
F. WALKER TUCEI; JUNE P. TUCEI; ROMAN H. UHING;
ALVERA A. UHING; VIETS FAMILY ASSOCIATES LLP,

Appellants.

* * * * * * * * * * * * * *

PAMELA M. TITTLE, ETC., ET AL.,

Plaintiffs,

PAMELA M. TITTLE,
ON BEHALF OF HERSELF AND A CLASS OF PERSONS SIMILARLY SITUATED,
AND ON BEHALF OF THE ENRON CORPORATION SAVINGS PLAN,
THE ENRON CORPORATION EMPLOYEES STOCK OWNERSHIP PLAN,
AND THE ENRON CORPORATION CASH BALANCE PLAN,

Plaintiffs-Appellees

VERSUS

ENRON CORPORATION, ET AL.,

Defendants.

* * * * * * * * * * * * * *

WASHINGTON STATE INVESTMENT BOARD, ET AL.

Plaintiffs,

VERSUS

KENNETH L. LAY, ET AL.,

Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \*

ABBEY NATIONAL TREASURY SERVICES PLC,

Plaintiff,

VERSUS

CREDIT SUISSE FIRST BOSTON CORPORATION; ET AL.,

Defendants.

_____

Appeals from the United States District Court
for the Southern District of Texas

_____

3

Before SMITH, STEWART, AND PRADO,
  Circuit Judges.

JERRY E. SMITH, Circuit Judge:

This appeal concerns a variety of securities class actions stemming from the downfall of Enron Corporation. These actions have similar substantive claims, but they differ with respect to the definition of the putative class. Appellants, a subset of members of the putative class in *Newby v. Enron Corp.*, No. H-01-CV-3624 (S.D. Tex.), timely objected to the proposed partial settlement with defendant Andersen Worldwide Societe Cooperative ("AWSC")[1] and most of its member firms. The district court held a "fairness hearing" before approving the settlement. The objectors from the putative *Newby* class (the "Objectors") appeal the decision to approve the $40 million partial settlement (the "Partial Settlement"). Finding no error, we affirm.

I.

In the interest of clarity, we divide our factual summary into three sections. They are (1) a brief synopsis of the financial events surrounding the collapse of Enron Corporation ("Enron") and those leading to the associated litigation; (2) a discussion of the relationship between AWSC and its affiliated Andersen firms (the "Member Firms"); and (3) the terms of the Partial Settlement.

A.

Throughout the 1990's Enron sold natural gas, electricity, and communications products to a variety of customers. Its share price soared through mid-2001, partially as a result of promising financial reports. The meteoric rise of Enron stock allowed industry insiders to reap windfall gains. The bubble burst on October 16, 2001, when Enron announced a shocking $618 million loss for the quarter, a figure attributable to the company's decision to reduce falsely inflated income and report concealed losses from earlier accounting periods. On November 8, 2001, Enron revealed that its accounting practices violated a number of laws and industry norms and that audit reports for 1997-2000 were inaccurate. Enron's share price fell precipitously, it is now bankrupt, and many of its senior officers have been indicted.

This consolidated appeal concerns a set of cases arising out of the Enron debacle, among them *Newby*, a securities fraud class action, and *Tittle v. Enron Corp.*, No. H-01-CV-3913 (S.D. Tex.), a related ERISA[2] claim alleging racketeering and negligence. The appeal also concerns *Wash. State Inv. Bd. & Employer-Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Lay*, No. H-02-3401 (S.D. Tex).

B.

The *Newby* defendants include a number of AWSC Member Firms, including Arthur Andersen LLP ("Andersen U.S."), an entity not party to the Partial Settlement. The plaintiffs lodged detailed and extensive allegations against a variety of Andersen business entities. These claims stemmed primarily from allegedly defective accounting procedures and audits. The Partial Settlement before us today involves (1) the plaintiffs in the *Newby*, *Tittle*, and *Washington State Investment Board* actions (the "Actions") and (2) the "Settling Defendants" (AWSC and the "Foreign Member

---

[1] Because AWSC is now in liquidation, the full name of the defendants is AWSC Societe Cooperative, en liquidation.

[2] Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*

4

Firms," with the term "Foreign Member Firms" denoting all AWSC Anderson affiliates excluding Andersen U.S.).

AWSC is a limited liability Swiss societe cooperative, a business entity with no American corporate analogue, formed under the Swiss Code of Obligations and domiciled in Geneva, Switzerland. AWSC coordinated the Andersen accounting network. Each Member Firm was formed under the laws of its domiciliary. A separate contract governed every individual relationship between AWSC and each member firm, including the Foreign Member Firms.[3] AWSC did not provide professional services to clients and its primary (but not exclusive) responsibilities involved establishing the professional standards by which the Member Firms were to abide.[4]

### C.

In August 2002 the representative plaintiffs in the Actions (together, the "Representative Plaintiffs") agreed to a $40 million partial settlement with AWSC and the Member Firms, excluding Andersen U.S. The parties submitted their Stipulation of Partial Settlement for $40 million in July 2003 and, in late Septem-

ber, several groups intervened to object to the Partial Settlement. After an October fairness hearing, the district court entered the judgment approving the settlement. Two groups of objectors (the "Rinis" and "Allen" objectors) timely appealed. The relevant terms of the Partial Settlement to which the district court gave preliminary approval are as follows:[5]

(1) the dismissal with prejudice of all of plaintiffs' past, present, and future claims, arising out of the Enron facts, against Settling Defendants, including Anderson-United Kingdom, Andersen-Brazil, and Arthur Andersen & Co. (India), the Foreign Member Firms already embroiled in litigation;[6]

(2) the release of plaintiffs' past, present, and future claims against successors in interest to the Settling Defendants;

(3) payment by AWSC of $40 million in order to establish the "Partial Settlement Fund," with the funds placed in escrow so that they may earn interest during the pendency of these proceedings;[7]

(4) the establishment of a $15 million fund for future court-approved class litigation expenses (the "Litigation Expense Fund");[8]

---

[3] The Foreign Member Firms, along with AWSC, are the defendants that are party to the Partial Settlement. This group includes those Member Firms against whom actions were pending: Anderson-United Kingdom, Andersen-Brazil, and Arthur Andersen & Co. (India).

[4] AWSC's duties involved the coordination of activities among the various Member Firms. AWSC would, for example, facilitate transnational assistance and accounting among member firms. AWSC was also responsible for dividing common costs, such as the costs of running Anderson's training center, among the other firms. It could not earn a profit and performed no audits.

[5] These are not all the provisions of the Partial Settlement. The full agreement is set forth in the Stipulation of Partial Settlement filed on August 29, 2002.

[6] This release does not apply to Andersen U.S. (Andersen U.S. is not a Settling Defendant).

[7] The funds earned about $335,000 in the first year.

[8] Milberg Weiss and other Plaintiffs' Settlement (continued...)

5

(5) the allocation, through confidential, binding, and non-appealable arbitration, of the remaining $25 million (the "Remainder") between, on the one hand, the consolidated *Newby* and *Washington State Investment Board* actions and, on the other, the *Tittle* action; and

(6) the payment from the Remainder to Plaintiffs' Settlement Counsel for as-yet unspecified but (ultimately) court-approved attorneys' fees.

## II.
### A.

A district court's approval of a class action settlement may be set aside only for abuse of discretion. See *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1997). The district court was extraordinarily meticulous in its analysis of the Partial Settlement Fund. The Objectors, on the other hand, continue to engage in what we can only describe as a maddening pattern of over-generalization and selective narration.

The gravamen of an approvable proposed settlement is that it be "fair, adequate, and reasonable and is not the product of collusion between the parties." *See id.* at 1330 (citing *Young v. Katz*, 447 F.2d 431 (5th Cir. 1971)). The district court faithfully applied a six-factor test in determining the appropriateness of the proposed settlement: (1) evidence that the settlement was obtained by fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the litigation and available discovery; (4) the probability of plaintiffs' prevailing on the merits; (5) the range of possible recovery and certainty of damages; and (6) the opinions of class counsel, class representatives, and absent class

members. *See Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983); *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982). The various facts pertaining to each of these elements are set forth in the respective subsections below.

The Objectors phrase their arguments in a variety of ways. Essentially, however, they take issue with certain aspects of the Partial Settlement pertaining to its fairness, reasonableness, and adequacy: (1) the size of settlement; (2) the fraction of the settlement devoted to expenses; (3) the propriety of the expense bills; (4) that payment to class members is deferred; and (5) the broad release of successors in interest to the Settling Defendants.

### B.

The Objectors protest the size of the settlement fund, contending $40 million to be a paltry sum in light of the Settling Defendants' potential liability. Draping this contention in vague accusations of collusion, they apparently believe the class representatives and counsel short-changed the class by failing to secure a larger settlement. The district court expended considerable effort delineating the specific reasons why a substantial recovery against the Settling Defendants was unlikely. We repeat them only briefly here.

First, the record reveals that AWSC and the Foreign Member firms were formed and operated principally under the laws of a foreign jurisdiction, rendering the prospect of satisfying personal jurisdiction requirements a daunting one. Second, the record reveals that the Plaintiffs were unlikely to establish even minimal liability on the part of the Settling Defendants. The Objectors' argument that AWSC engaged in legally cognizable wrongs rests almost entirely on conclusional testimony con-

---

[8](...continued)
Counsel do not currently seek attorney fees.

6

tained in two supplementary affidavits.[9] The remainder of the Objectors' arguments are premised on pithy statements of worldwide corporate unity found in marketing materials. We decline, as did the district court, to afford those corporate clichés considerable weight.

AWSC identified a number of other courts rejecting claims against AWSC or Andersen as a single, worldwide organization. The Objectors fail to rebut this submission with any caselaw. The Objectors reason that we should consider AWSC and the Member Firms to be a single, worldwide organization because, if such were not the case, the Objectors argue, why would the Foreign Member Firms have contributed to the AWSC settlement?

The answer, provided in much detail during the fairness hearing, is that they did so not because of their potential for liability, but because any potential association with Enron "poisoned' opportunities for them to merge with other companies and to "get on with their lives."[10] We consider this issue in further detail in the factual insufficiency discussion of part IV, *infra*.

---

[9] These were the affidavits of Burton Carlson and Gilbert Viets, who stated that

[AWSC] was the entity in charge of establishing and enforcing accounting and professional standards as well as quality control techniques and procedures of, education and training personnel of, and coordinating client services on a worldwide basis for, all of its member firms, including Arthur Andersen LLP and any other affiliated entities that may have provided professional services to Enron.

[10] In fact, the Foreign Member Firms had already settled with the Enron estate in bankruptcy court.

Finally, the district court determined that there would be almost insurmountable problems collecting any judgment against the Settling Defendants. This is because of, *inter alia*, (1) the financial insolvency of AWSC and many of its member firms and (2) the unwillingness of foreign sovereigns to enforce U.S. judgments against them.

Counsel for the *Tittle* and the *Newby* plaintiffs submitted that the settlement was fair, adequate and reasonable, and in the best interests of the class. Although at the fairness hearing lead counsel for the *Newby* class was hesitant to state explicitly his belief in the weakness of the claims against the Settling Defendants, counsel for the *Tittle* plaintiffs was more candid: "Without the settlement agreement, which was reached prior to the Court's ruling on the motions to dismiss, and after very serious and often contentious arm's length negotiations, the Tittle plaintiffs could very well have had no recovery at all against AWSC." We consider the class's small estimated recovery sufficient to justify the sum upon which the plaintiffs and Settling Defendants agreed.

### C.

As we have discussed, the Objectors question the magnitude of the settlement. In addition, as we will now examine, they challenge the fraction ($15 million, or 37.5%) devoted to the Litigation Expense Fund.

### 1.

The reasonableness of the expenses incurred during the course of the litigation is not before the court; only the structure of the settlement fund is. As the district court noted, each round of notice for expenses costs rough-

ly $750,000.[11] If the plaintiff class were to incur that sum each time class counsel withdraws money for expenses, the administrative costs would cannibalize much of the Partial Settlement.

Professor Eric Green, a respected, court-appointed mediator, suggested the creation of a litigation expense fund to reduce such redundant and costly notification. Each time class counsel must withdraw funds for expenses associated with future litigation, the court must approve them. In other words, the $15 million litigation expense fund is neither (1) a vehicle to finance expenses exclusively associated with this $40 million settlement nor (2) a blank check to class counsel.

2.

The Allen Objectors further argue that recovery is highly speculative, but this argument is both vague and unpersuasive.[12] The objection does not even specifically mention the expense fund, nor does it invoke any authority

for the proposition that a settlement must always result in a class award at the time the settlement is made. Absent some inkling of why the Litigation Expense Fund is irrational (particularly in light of the enormous administrative expense associated with the Enron class actions), we uphold the district court's approval of the litigation defense fund as a sound exercise of discretion.

3.

The Rinis Objectors submit ten full pages of faulty accounting. First, they compute the fraction of the partial settlement attributed to expenses to be 37.5% by dividing $15 million by $40 million. They then argue that this fraction is unreasonable in light of much smaller ratios in other settlements.

The Rinis Objectors inaccurately state the numerator, because the $15 million Litigation Expense Fund is not money assigned to class counsel, but merely a guaranteed pool from which class counsel may withdraw fundsSSbut only with the imprimatur of the district court. If expenses on future litigation do not total more than $15 million, that money is to be dispensed to the class.

More importantly, they incorrectly state the denominator, because the instant agreement is a partial, rather than final, settlement. We cannot now state with any confidence what the denominator will ultimately be, but the final figure will substantially exceed $40 million. These two mathematical adjustments bring the likely ratio of expenses-to-settlement in line with the cases the Rinis brief cites.

D.

The Objectors contest the propriety of the expenditures. As the district court noted on numerous occasions, the propriety of class

---

[11] The Rinis objectors mistakenly calculate the notification costs as the number of class members times postage ($407,000), ignoring the costs of printing notices, publicizing notice in newspapers, paying claims administrators to oversee the process, and printing the notices themselves.

[12] This argument consists of two sentences in their opening brief:

In approving this settlement, the District Court abused its discretion because it did notSSand could notSSdetermine what compensation the class members would actually receive. There was no basis in the record to conclude that the settlement proceeds will be used to pay anything but attorney's fees and expenses. There was no basis to conclude that the class members will receive anything.

counsel's litigation expenditures was not before it and is not before us now. The Rinis Objectors' references to emptying personal cookie jars and their backhanded remarks about crawfish festivals notwithstanding,[13] the application for expenses is only now pending before the district court. That court will not summarily award future expenses; notice to the parties, including an opportunity to challenge, will accompany each application. Any emphasis on the propriety of the expenditures is, at this time, misplaced.

### E.

The Objectors argue, on two grounds, that deferred payment is unreasonable. First, they contend that the $25 million Remainder leaves little for the class. Second, they speculate that the Partial Settlement's deferral provisions exist entirely to defer class counsel's income tax liability and to remove nominal risks of litigation involving future costs.

It is untrue that there will be nothing left in the Remainder for the class members. Class Counsel has not yet applied for attorney fees, although it is true that those fees will be deducted from the $25 million Remainder. The disbursement of the Remainder, however, is not being deferred because of any delay in Class Counsel's submission of attorney fee applications; rather, it is deferred because the administrative costs of the disbursement militate in favor of deferral until the classes settle with other defendants.[14]

Second, the speculative accusations that Class Counsel's desire to minimize future tax liability drives the deferral provisions are poorly theorized. The deferral provisions allow settlement with peripheral defendants, against whom the substantive claims are quite weak, to proceed with all possible speed. If the district court were to reject the deferral mechanism, then the plaintiffs could not settle with the peripheral defendants unless such settlement coincided with settlement against a principal defendant (so that the proceeds could be disbursed simultaneously). Vitiating the deferral provisions would harm plaintiffs, who

---

[13] In their opening brief, the Rinis Objectors state that

> [f]lying back and forth across the country 500 times, attending crawfish festivals and attempting to charge injured class members nearly $60,000 for the purchase of computer equipment, all contribute to the perception that class counsel is succumbing to the temptation to use the sheer catastrophic size of the instant action as their own personal cookie jar.

The travel expenses are in fact well documented, and the reference to the crawfish festival during the fairness hearing was used as a means of referencing the date of the mediation session and was not advanced as a reimbursable expense.

---

[14] The Allen Objectors cite to the Class Notice for the proposition that none of the proceeds from the settlement will be distributed. That notice says:

> Because of the aggregate amount of damages that Plaintiff's Settlement Counsel assert were suffered by Settlement Class Members, it is not economically feasible to distribute the Gross Settlement Fund to Settlement Class members *at this time*. Plaintiff's Settlement Counsel anticipate that such distributions *will occur with additional recoveries against the remaining Defendants* in the Actions.

(Emphasis added.) The Allen Objectors are self-evidently incorrect. The notice explicitly says that the proceeds will be distributed in association with future settlements, not that they will not be distributed at all.

would forfeit potential sources of recovery and would harm defendants, who would have to defend themselves needlessly in court when there exist viable settlement opportunities.

F.

The Objectors contest the scope of the legal release. The settlement releases AWSC and the Foreign Member Firms, and any past, present, or future successors in interest, from any subsequent Enron liability. The release provisions are worded extremely carefully because, as the record reveals, they were the most important element of the partial settlement. It bears repeating that no provision of the Partial Settlement releases Andersen U.S. from any past or future liability.

Most of the confusion on the release issue centers on the meaning behind the following passage, offered by Milberg Weiss attorney Keith F. Park at the fairness hearing:

> [I]n the bargaining process to get to the 40 million, [potential Member Firm or successor liability] was a chip that was on the table. We don't know what it wasSSwe couldn't quantify what it was worth. We frankly didn't think it was worth that much in terms of the effort to go after the successor firms; but we weren't going to get the 40 million because this money was not being put up, as I understand, by AWSC.

The rationale for the release is straightforward. The prospect of recovering against the Foreign Member Firms was slim because of the above-cited legal obstacles: personal jurisdiction, liability, and judgment collectability. Ordinarily, under such circumstances, those firms would just refuse to settle. They funded the AWSC settlement in this instance because, in spite of the negligible likelihood of legal

liability, they were unable to "get on with their lives" because of their "toxic" association with the Enron debacle. The release allowed them to merge with other firms because those firms no longer feared Enron liability. The releases were therefore the *sine qua non* of the settlement.

The Allen Objectors contest the release in light of the district court's failure to order discovery to determine whether valid claims exist against successor firms. They criticize the court for accepting the claims about limited prospects for recovery against successors on face, but offer no evidence that refutes this position. They offer as precedent *Nat'l Super Spuds, Inc. v. New York Mercantile Exch.*, 660 F.2d 9, 18-20 (2d Cir. 1981), for the proposition that a release that forecloses claims other than those asserted in litigation is overbroad.

First, *Super Spuds* is from another circuit and hence does not bind us. Second, and more importantly, although the Partial Settlement does release unidentified successors from a variety of claims, including those that remain undisclosed, the Andersen release is not analogous to that at issue in *Super Spuds*.

In that case, the release was problematic because the releasing party did not have the authority to make the release. The named plaintiffs represented members of the class with respect to certain contracts, but released potential defendants from potential liability as to others. *See id.* at 18.

The Representative Plaintiffs, on the other hand, do not make a broader release than that to which they are authorized by the terms of their class representation. Moreover, the Allen Objectors ignore footnote 7 of *Super Spuds*,

which identifies the specific circumstances of the instant settlement as warranting more permissive treatment.[15]

The releases do not immunize the successor firms from liability for their *own* conduct, either related or unrelated to the Enron litigation. They immunize these firms from liability insofar as that liability would have attached by virtue of their acquisition of interest in one of the Foreign Member Firms. The release provisions are carefully crafted to have the same effect they would have had they been given to a Foreign Member Firm before merger or acquisition by a successor.

## III.
### A.

The scope of discovery to be conducted in each case rests within the sound discretion of the district court. *See Cotton v. Hinton*, 559 F.2d 1326, 1333 (5th Cir. 1977) (citing *Burns v. Thiokol Chem. Corp.*, 483 F.2d 300 (5th Cir. 1973)). AWSC argues that the Allen Objectors did not preserve the discovery error, thereby waiving it on appeal. If, however, a litigant raises an argument sufficient for the district court to rule on it, we consider the error preserved. See *New York Life Ins. Co. v. Brown*, 84 F.3d 137, 141 n.4 (5th Cir. 1996). In their September 24 objections, the Allen Objectors requested, albeit in a footnote, fur-

ther discovery.[16] This request was not very precise but, because the Allen Objectors lose on the merits, the issue is moot.

### B.

The Allen Objectors advance two related discovery arguments. They request discovery to explore (1) the potential for securing a judgment against AWSC and the Foreign Member Firms and (2) the possibility of collusion. The district court did not abuse its discretion in refusing to order discovery on both fronts.

"[F]ormal discovery [is not] a necessary ticket to the bargaining table." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. Apr. 1981). This court, on several occasions, has rejected precisely the proposition the Allen Objectors propound: that "the settlement process is necessarily inadequate unless informed by the process of discovery." *Id.* In considering whether a rejection of discovery was an abuse of discretion, we consider whether Objectors' counsel was "groping in the darkness." *See Cotton*, 559 F.2d at 1332.

Generally speaking, a settlement should stand or fall on the adequacy of its terms. *See Corrugated Container*, 643 F.2d at 211. The overriding theme of our caselaw is that formal discovery is not necessary as long as (1) the interests of the class are not prejudiced by the settlement negotiations and (2) there are substantial factual bases on which to premise

---

[15] Footnote 7 excepts the situation in which a settlement releases defendants from class members subsequently asserting claims relying on a legal theory different from that relied on in the class action complaint but relying on the same set of facts. It goes on to distinguish the facts before that court from such a situation. See *Super Spuds*, 660 F.2d at 18 n.7. The Andersen settlement grants releases only for claims within the set of those arising out of the facts asserted in the Consolidated Complaint.

[16] That footnote stated, "The Objecting Class Members request that the Court permit them to conduct discovery relating to the conduct of the negotiations and the settlement terms to determine whether their interests and those of other class members have been adequately represented."

settlement.

The Objectors' first discovery-related argument relates to the district court's failure to order full discovery into the true financial condition of AWSC and the Foreign Member Firms. First, the record shows that Plaintiffs' Counsel undertook a massive analysis of the circumstances surrounding Defendants' potential liability.[17] Second, and more importantly, the financial condition of the firms was beside the point.

As the district court discussed at length, the settlement is desirable not necessarily because the Foreign Member Firms were immediately insolvent (although there are considerable indications that they were), but because (1) the court's personal jurisdiction over them was in doubt, (2) their ultimate expected liability was minimal or non-existent, and (3) even if the court entered judgment against them, collecting the judgments appeared to be an exercise in legal futility. Assessing the impact of these variables requires legal analysis, not factual discovery into the financial condition of the Settling Defendants.

Plaintiffs' counsel, defendants, and mediator Green concurred with this analysis. The district court did not abuse its discretion in determining that discovery into the assets of the Foreign Member Firms was unnecessary in light of those figures' status as a secondary settlement consideration.

The Objectors' second contention is that, by failing to order discovery, the court left un-

explored the possibility that the settlement was the product of collusion.[18] That accusation has never, at any point in the record, been advanced with the slightest factual substantiation. Moreover, Green oversaw the court-ordered mediation, holding four separate meetings at which the parties hammered out various settlement terms. There is no reason to believe that the Regents of the University of California, the court-selected lead plaintiff in *Newby* and the public body disclosing the settlement, has engaged in anything other than what the district court described as "highly professional administration of the litigation, as have counsel for the Tittle action."

Finally, in arguing that the court abused its discretion in denying further discovery, the Allen Objectors rely on non-binding precedent from other circuits; even that precedent does not support the proposition the Objectors urge. For instance, they cite *Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 997 (9th Cir. 1985), but that case has to do with a district court's failure to analyze an intervenor's objection entirely, not a court's refusal to order discovery.[19] *See id.*

The Objectors also rely on *Girsh v. Jepson*, 521 F.2d 153, 157, 159-60 (3d Cir. 1975). In that case, however, the objector submitted four carefully delineated interrogatories, *see id.* at 157, rather than a generalized, open-ended plea for more evidence along the lines of that which we confront here. Moreover, the reviewing court's analysis in that case was

---

[17] For example, Milberg Weiss attorney Helen Hodges, counsel to the Regents, submitted a sworn statement that AWSC and many of the Foreign Member Firms were on the brink of bankruptcy.

[18] The Objectors apparently smell a fix because of the timing of the preliminary settlement approval application and the liquidation of AWSC.

[19] In fact, neither the word "discover" nor "discovery" appears in the case.

animated primarily by the district court's failure to allow the intervenor to participate effectively in the settlement hearing. *See id.*

Finally, the Objectors rely on *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1123-25 (7th Cir. 1979). There the court was concerned about "attorney-shopping," where a person unofficially representing a plaintiff in negotiations "shops" a settlement to appease defense counsel. *See id.* at 1125.

There are no such concerns in this case. Not only was there complete clarity regarding who was representing the plaintiffs at the bargaining table, but there was a court-appointed neutral mediator who oversaw the negotiations.

### IV.
The Objectors contend that the record was factually insufficient to support the approval. There is significant overlap between the arguments they make here and those covered under our discussion in part II of whether the Partial Settlement terms are facially fair and reasonable.

We again emphasize that the record was exceptionally well-developed. Multiple parties submitted sworn statements regarding the financial state and legal status of various defendants. Green oversaw a protracted, involved court-appointed mediation. The various counsel first submitted their Stipulation of Partial Settlement in August 2002.

The district court admitted several sets of objections and responses, conducted a settlement hearing in July, and had a separate fairness hearing in October. Only then did the court issue findings of fact and conclusions of law in November. The record contains, in addition to the entire consolidated complaint, all of these sworn statements, opinions of counsel, objections, responses, and hearing transcripts. The proposition that the district court made its findings based on a malnourished record borders on being frivolous or even absurd.

### A.
Approval of a class action settlement may be set aside on appeal only for abuse of discretion. See *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1997).[20] In other words, the same standard applies without regard to whether we are reviewing the facial reasonableness of the settlement terms or the factual sufficiency of the record underlying them.

### B.
As explained in part II.A, the district court faithfully applied a six-factor test in determining the appropriateness of the proposed settlement: (1) evidence that the settlement was obtained by fraud or collusion; (2) the complexity, expanse, and likely duration of the litigation; (3) the stage of the litigation and available discovery; (4) the probability of plaintiffs' prevailing on the merits; (5) the range of possible recovery and certainty of damages; and (6) the opinions of class counsel, class representatives, and absent class members. *See Reed*, 703 F.2d at 172; *Parker*, 667 F.2d at 1209.

The court considered arguments and found (1) no concrete evidence of collusion; (2) that

---

[20] The litigants also quibble over whether the Allen Objectors preserved the error. The Allen Objectors style this argument as an appeal of the district court's credibility determination. Given our disposition, this issue is moot.

the complexity, duration, and expense of the impending litigation was, for all parties, enormous; (3) that future discovery would be expensive but (4) that the plaintiffs chances for prevailing on the merits remained slim; (5) that even if plaintiffs were to prevail on the merits, there are significant jurisdictional obstacles to recovery; and (6) that Class and Defense Counsel concurred in the court's judgment. There is extensive support in the record for each proposition, particularly in the transcript of the fairness hearing. In the remainder of this discussion we address only the Objectors' more specific arguments.

C.

The statement of Allen Objectors Burton Carlson and Gilbert Viets, former Andersen employees, was submitted in an affidavit:

> AWSC was the entity in charge of establishing and enforcing accounting and professional standards, as well as quality control techniques and procedures of, educating and training personnel of, and coordinating client services on a worldwide basis for, all of its member firms, including Arthur Andersen LLP and any other affiliated entities.[21]

First, these facts, even if true, were insufficient to create liability for AWSC when the same relationship between Andersen U.S. and AWSC was adjudicated in *In re WorldCom, Inc.*, 2003 WL 21488087 (S.D.N.Y. June 25,

2003), at \*9-\*10.[22] Moreover, the district court weighed the Andersen Affidavits against voluminous material submitted to the court and delivered at the fairness hearing to the contrary. These materials contain the considered opinion of counsel and recitation of substantial caselaw, both of which strongly suggest that the Objectors' prospects for prevailing on the merits are dubious.

The Allen Objectors, of course, argue that the district court should have accepted the sworn Andersen Affidavits as accurate or should have allowed further discovery. It cites two cases for this proposition, and neither one is even close to being on point.[23] Even assuming *arguendo* that the court should have credited the Andersen Affidavits, the Allen Objectors still advance no response to the obstacles involving personal jurisdiction and collectability, not to mention a detailed analysis of the other five factors used in analyzing the propriety of settlement.

---

[21] Certification, Proof of Membership In Settlement Class and Objections of Gilbert Viets; Certification, Proof of Membership In Settlement Class and Objections of Burton W. Carlson (collectively the "Andersen Affidavit").

[22] Admittedly, *WorldCom* involved a pleading deficiency: The litigant did not plead a sufficient relationship between AWSC and Andersen U.S. *WorldCom* does, however, strongly suggest that to create derivative liability, Andersen U.S. must be found to be some sort of "agent" of AWSC's. *See WorldCom*, 2003 WL 21488087, at \*10.

[23] In *Molina v. Sewell*, 983 F.2d 676,681 (5th Cir. 1993), the court objected to the use by the Board of Immigration Appeals of off-record facts to reach a conclusion on an immigration "entry" claim. The court ruled that the Board abused its discretion by relying on this off-record evidence without even admitting sworn testimony in conflict with it. *See id.* In *Foreman v. Dallas County, Tex.*, 193 F.3d 314, 327 (5th Cir. 1999), the cited text constitutes the panel's rebuke of the district court's failure to credit an affidavit where there was no conflicting evidence.

### D.

The Allen Objectors argue that the district court gave too much weight to the unsworn opinions of class counsel. First, there is considerably more material in the record than unsworn opinions. *Newby* Plaintiff Counsel Helen Hodges and the co-lead counsel for the *Tittle* class both submitted sworn declarations expressing concern over the prospect that the district court would grant the motions to dismiss.

Second, the weight the district court attached to the opinions of class counsel, relative to those of the Allen Objectors, was justified in light of their superior sophistication. For the proposition that the court cannot rely so heavily on the opinions of class counsel, the Allen Objectors point to *Holmes v. Cont'l Can Co.*, 706 F.2d 1144 (11th Cir. 1983).

*Holmes* is non-binding precedent from another circuit[24] and is premised on a set of facts that differ from those presented here. *Holmes* is a class action for back-pay where the amount of back pay for each class member was determined entirely by the testimony of class counsel. *See id.* at 1149. That reversal was premised on the fact that the back pay award was "disproportionate and facially unfair." *Id.* at 1150. No such circumstances exist in the instant settlement.[25]

---

[24] The Allen Objectors also cite a variety of other district court cases, only some of which were reviewed by this court.

[25] Of course, in one sense the settlement affects class members disproportionately—class members with more stock receive a greater windfall than do those with less. The amount of equity belonging to a particular stockholder, however, is an objective index of entitlement to settlement proceeds and (continued...)

### V.
### A.

The Objectors assert a crudely articulated due process objection. Failure to raise a due process objection before a district court waives that objection on appeal. *See Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002). Litigants must allege constitutional violations with "factual detail and particularity." *Jackson v. Widnall*, 99 F.3d 710, 716 (5th Cir. 1996) (quoting *Schultea v. Wood*, 47 F.3d 1427, 1430 (5th Cir. 1995) (en banc)).

The Rinis Objectors assert that they could not have waived due process because it is the "bedrock" underlying FED. R. CIV. P. 23. Parsing the Rinis Objectors' due process objections is difficult generally, but this argument is particularly puzzling. It does not follow that, merely because considerations underlying procedural due process protection may be similar to those driving rule 23, a litigant cannot waive that protection (what would be a statutory, not a constitutional protection, no less) by failing to make the argument in front of a district court.

The Rinis Objectors then argue that they actually preserved the error because, although they did not explicitly invoke due process, their objections included things such as "a lack of fairness, adequacy, or reasonableness to the class. . . ." This phraseology is not particular enough to justify a conclusion that the Rinis Objectors preserved the error, particularly because that phrase is also the operative language in lodging a non-constitutional objection to a settlement.

---

[25](...continued)
does not invite the sort of subjectivity with which the *Holmes* court was concerned.

### B.

Even if we were to decide that the Rinis Objectors preserved the due process error, they would lose on the merits. They advance two vague due process arguments. First, they argue that the Partial Settlement violates due process because the district court cannot at this time evaluate the expenses it ultimately will award the plaintiff classes. Second, they urge that the deferral provisions violate due process. Neither argument is persuasive.

### 1.

The Partial Settlement does not purport to award any costs or fees, so it cannot, as the Objectors posit, violate due process just by awarding costs that are impossible for the district court to evaluate. The Objectors' argument is again premised on a misunderstanding of what was before the district court.

The court approved the structure of the Partial Settlement and did not approve any actual expenses or fees. Portions of the Litigation Expense Fund are to be disbursed to class counsel only (1) after the costs have been incurred in the litigation; (2) the court reviews and approves the expenses, using the essential "*Johnson*" factors to evaluate reasonableness, see *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974); (3) notice is given to the parties; (4) notice is given to the objectors; and (5) all have an opportunity to challenge the funds sought. Such substantial procedural protection does not violate principles of due process.[26]

### 2.

In part II.E, we set the forth the justification for the deferral provisions in considerable detail. Those provisions are desirable because they allow the settlement proceeds to be disbursed only after the administrative costs of disbursing them become a relatively small fraction of the payment. Deferment also promotes speedy settlement with peripheral defendants that, given the economics of disbursement, would otherwise be unobtainable. The settlement proceeds will be held only until the plaintiff classes can secure a more substantial recovery through resolution of outstanding claims, and it will then be distributed to class members.

The rest of the Rinis Objectors' arguments merely repeat the contentions regarding expense propriety that, for reasons discussed above, are not properly before us today. Given these considerations, we decline to find a due process violation merely because payment is not immediate.

AFFIRMED.

---

[26] Plaintiffs' counsel have not even applied for fees.