DA 11-0431

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 198

TYSON S. PALLISTER, KEVIN BUDD,
JESSICA NORMANDEAU, and LAURA FORTUNE,

        Class Members and Appellants,

    v.

BLUE CROSS AND BLUE SHIELD OF MONTANA,
INC., AND MONTANA COMPREHENSIVE HEALTH
ASSOCIATION,

        Defendants and Appellees,

    v.

BRITTANY C. SMITH, RENEE NEARY, as parent and
guardian of Dylan Dallaserra; KRISTA LUCAS and
ALICE JEAN SPEARE; each individually and as
representative members of a class of similarly
situated plaintiffs,

        Class Representatives and Appellees.

APPEAL FROM:    District Court of the Second Judicial District,
In and For the County of Butte/Silver Bow, Cause No. DV-08-553
Honorable Bradley G. Newman, Presiding Judge

COUNSEL OF RECORD:

        For Class Members and Appellants Pallister, Budd and Normandeau:

            James G. Hunt (Argued), Jonathan McDonald, Dix, Hunt & McDonald,
Helena, Montana

            Erik B. Thueson, Thueson Law Office, Helena, Montana

            Jory C. Ruggiero, J. Breting Engel, Western Justice Associates,
Bozeman, Montana

For Class Member and Appellant Laura Fortune:

Lawrence A. Anderson (Argued), Attorney at Law, Great Falls, Montana

Rex Palmer, Attorneys Inc., P.C., Missoula, Montana

For Appellee Blue Cross and Blue Shield of Montana, Inc.:

Michael F. McMahon, Stefan T. Wall (Argued), McMahon, Wall & Hubley, PLLC, Helena, Montana

For Appellee Montana Comprehensive Health Association:

Jacqueline T. Lenmark (Argued), Keller, Reynolds, Drake, Johnson & Gillespie, P.C., Helena, Montana

For Class Representatives and Appellees:

Robert G. McCarthy (Argued), McCarthy Law, P.C., Butte, Montana

Argued: April 11, 2012
Submitted: April 26, 2012
Decided: September 5, 2012

Filed:

Clerk

2

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     This case arises out of claims asserted by multiple persons against Blue Cross and Blue Shield of Montana (BCBSMT) and Montana Comprehensive Health Association (MCHA).[1]  Claimants assert that while they were fully insured by BCBSMT or MCHA, they submitted claims that the insurers denied based upon exclusions contained in their insurance policies.  These exclusions were subsequently disapproved by the Montana Commissioner of Insurance (Commissioner) and the insureds sought the previously-denied benefits.  Eventually, the matter evolved into a class action and three of the claimants, Krista Lucas, Brittany Smith, and Alice Speare, were named class representatives.[2]  A class was certified that included claims filed—or claims that could have been filed—from December 29, 2000, through December 31, 2008.  Class counsel was appointed.  Subsequently, a settlement was negotiated.  Three other claimants, Tyson Pallister, Kevin Budd and Jessica Normandeau, objected to the settlement and sought review by the Second Judicial District Court.  The District Court approved the settlement.  Pallister, Budd and Normandeau appeal asserting numerous errors by the District Court including but not limited to the court's error in denying Pallister's motion to conduct discovery.  We reverse and remand on the discrete issue of discovery and vacate the

---

[1] MCHA is a program that offers policies of individual health insurance to eligible Montana residents who are considered uninsurable due to medical conditions.  MCHA coverage is also available to persons who are leaving group coverage.  Montana Comprehensive Health Association, http://www.mthealth.org (accessed August 23, 2012).
[2] Renee Neary, named in the caption of this case, was dismissed as a plaintiff on December 11, 2009.

3

District Court's approval of the Settlement Agreement. As a result, we do not address the parties' remaining allegations of error.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2     This case has a long and complex procedural history. It involves multiple actions filed by numerous individuals in two state district courts and in the Montana federal court, as well as an interim proceeding before this Court. Our resolution of this matter does not require that we recite a detailed description of the many parties and their claims. However, to the extent facts pertaining to specific parties are relevant to our analysis, they are presented below.

¶3     The appellants/objectors, the class representatives/appellees, and all class members, were insured by BCBSMT or MCHA at the time they were injured in separate automobile accidents over a period of several years. They were covered under both ERISA[3] and non-ERISA policies. Each of their policies contained an exclusion for automobile medical coverage, generally providing that the insurer would not pay for health care costs of its injured insureds if the insureds received, or were entitled to receive, benefits from any automobile liability policy. The parties filed timely claims for benefits with BCBSMT and/or MCHA based upon the dates of their respective accidents and the insurers denied all, or part, of their claims based upon the exclusions in their individual policies.

---

[3] ERISA, the Employee Retirement Income Security Act, is a federal law which establishes minimum standards for retirement and health benefits plans in private industry. U.S. Dept. of Labor, http://www.dol.gov/ebsa/compliance_assistance.html (accessed August 23, 2012).

¶4 An earlier action initiated by complaints to the Commissioner about BCBSMT's denial of claims based upon these or similar exclusions was the forerunner to the case now before us. In *Blue Cross & Blue Shield of Mont. v. Mont. State Auditor*, 2009 MT 318, 352 Mont. 423, 218 P.3d 475 (*State Auditor*), we explained that BCBSMT submits its policy forms to the Commissioner for approval in accordance with applicable law, § 33-1-501, MCA. In October 2001, the Commissioner disapproved certain terms, conditions and provisions contained in BCBSMT's policies and forms, including the above-referenced automobile insurance exclusion provisions. BCBSMT requested an administrative hearing. *State Auditor*, ¶ 5. In March 2002, the Commissioner and BCBSMT reached an agreement, memorialized by correspondence rather than a formal order, allowing BCBSMT to continue to use the agreed-upon exclusion language in its forms. The administrative proceeding was not dismissed and BCBSMT continued using these forms through most of 2006. *State Auditor*, ¶ 6.

¶5 In October and November 2006, BCBSMT once again submitted forms containing the exclusion language to the Commissioner for approval. In May 2007, the Commissioner disapproved the forms on the grounds that the exclusion language conflicted with the subrogation statutes at §§ 33-30-1101 and -1102, MCA (2005), and applicable case law. Resurrecting the 2002 administrative hearing proceeding, BCBSMT requested a contested case hearing which was held in July 2007. The hearing examiner issued his proposed findings of fact and conclusions of law in October 2007 upholding the decision to disapprove the forms. *State Auditor*, ¶ 6.

¶6 In March 2008, the Commissioner adopted the hearing examiner's proposed decision. BCBSMT sought judicial review by the First Judicial District Court. That court, in December 2008, upheld the Commissioner's decision and BCBSMT appealed. *State Auditor*, ¶ 7. On September 24, 2009, we affirmed the Commissioner's rejection of the forms, expressly holding that the exclusions allowed BCBSMT:

> to avoid any payment of benefits to its insured if the insured is "entitled to receive" benefits from any other auto . . . liability policy, whether or not the insured actually receives any of those benefits, and whether or not the insured has been made whole. Only when the insured is made whole as defined in Montana law, and then only after BCBS has paid out benefits to its insured, could BCBS be entitled to claim subrogation. . . . The BCBS exclusions therefore violate Montana statutory and case law on subrogation.

*State Auditor*, ¶ 19.

¶7 It is against the backdrop of *State Auditor* that the action currently before us was filed and evolved into a class action, potentially including over 3,000 class members who were denied benefits between 2000 and 2008 based upon these policy exclusions.

## ISSUE

¶8 The dispositive issue for purposes of this Opinion is whether the District Court abused its discretion by denying Pallister's motion to conduct discovery.

## STANDARD OF REVIEW

¶9 We review a district court's discovery rulings for an abuse of discretion. *Heggem v. Capitol Indem. Corp.*, 2007 MT 74, ¶ 17, 336 Mont. 429, 154 P.3d 1189.

## DISCUSSION

¶10 *Did the District Court abuse its discretion by denying Pallister's motion to conduct discovery?*

6

¶11 Neary, Lucas and Speare filed their initial action against BCBSMT in the Second Judicial District Court on December 29, 2008, shortly after the First Judicial District Court affirmed the Commissioner's decision in *State Auditor*. In January 2009, their case was removed to federal court where Neary was ultimately dismissed as a plaintiff. In March 2009, MCHA moved, and was granted the right, to intervene as a defendant. The case remained in federal court until January 14, 2010, when it was remanded back to the Second Judicial District Court.[4]

¶12 On the day the Second Judicial District Court again took control of the case, BCBSMT, MCHA, Lucas, and Speare filed a M. R. Civ. P. 23(c) (Rule 23) Stipulation for Class Certification Consideration (Stipulation) with the District Court.[5] In this Stipulation, they agreed to consolidate their case with a similar case filed by Smith against BCBSMT in September 2009 in the Second Judicial District Court.[6] The consolidated case for purposes of this Opinion will be referred to as *In re BCBSMT/MCHA*. On January 19, 2010, Pallister and Budd moved to intervene, as a matter of right, in *In re BCBSMT/MCHA*. Normandeau then moved to intervene as well.[7] The proposed intervenors, who were members of the class, believed the Stipulation compromised and did not protect their rights. They requested that the District Court take

---

[4] In the meantime, we decided *State Auditor* in September 2009.
[5] We acknowledge that Rule 23 controls the aspects of a class action; however, we need not address the Rule 23 factors in this Opinion as they are not applicable to the issue before us.
[6] Unless otherwise specified, hereinafter Lucas will refer to Lucas, Speare and Smith collectively.
[7] Unless otherwise specified, hereinafter Pallister, or Objectors, will refer to Pallister, Budd and Normandeau collectively.

no action on the proposed Stipulation until the proposed intervenors had fully briefed the issue and the court ruled on their motions for intervention.

¶13 On January 22, 2010, BCBSMT, MCHA and Lucas filed a Stipulated Protective Order governing the "use of 'Confidential Information' produced in response to any discovery request, deposition, subpoena or other means." "Confidential information" was defined, in part, as "any patient and/or client information including but not limited to name of patient, date of birth, Social Security number, healthcare information, billing record, note, or other document, generated and/or maintained by [BCBSMT] or [MCHA] or any person or entity on their behalf, involving financial or proprietary information." The District Court judge signed both of the insurers' and Lucas's stipulated motions on January 22.

¶14 On January 25, 2010, Honorable John Whelan as mediator met with counsel for BCBSMT, counsel for MCHA, and Smith, Speare and their attorney to discuss a proposed settlement agreement. Whelan's report dated February 3, 2010, concluded that "the terms and conditions of [BCBSMT, MCHA, Speare and Smith's] Settlement Agreement are fair, reasonable and adequate to resolve this matter." Whelan recommended that the District Court approve the settlement. At this point in time, the class had not yet been certified, nor had class counsel been approved. The settlement negotiations were conducted under the "Confidential Information" protective order precluding settlement information from being provided to purported class members. Notably, Whelan's report references neither the existence of the objectors nor their concerns.

¶15 On February 4, 2010, BCBSMT, MCHA and Lucas filed a Joint Motion for Preliminary Certification and Settlement Approval. The joint motion sought preliminary certification of four defined classes, appointment of class counsel, and approval of their January 25, 2010 Settlement Agreement.

¶16 On April 9, 2010, the District Court denied the January 2010 motions to intervene.

¶17 On May 27, 2010, the District Court preliminarily certified the class action and preliminarily approved the Settlement Agreement reserving final approval until after a Settlement Fairness Hearing was conducted.

¶18 On June 10, 2010, Pallister, individually, filed a Motion to Conduct Discovery in *In re BCBSMT/MCHA* seeking discovery into "the fairness of the preliminary settlement, class certification and appointment of class counsel." He argued that information "about how many class members exist, the methodology used by BCBSMT to identify class members, [and] the medical bills incurred by class members" was not available to assist the class members, counsel, the mediator, or the court, in determining the fairness of the Settlement Agreement.

¶19 On August 5, 2010, the District Court, citing Rule 23(d) which grants the trial court discretion to make appropriate orders governing the fair conduct of class actions, denied Pallister's motion to conduct discovery. Relying on federal authority, the court explained that it could "permit limited discovery where such process would assist [it] in determining the fairness and adequacy of a settlement." It further stated that "discovery by an individual class member is appropriate only in those rare cases in which the class member 'lays a foundation by adducing from other sources evidence indicating that the

9

settlement may be collusive.' " The court determined that, under the circumstances of the case, Pallister's "motion and supporting documents . . . fail to satisfy Pallister's burden of showing independent evidence that the settlement negotiations involved collusion or other unfair conduct." In early September 2010, Normandeau, Fortune,[8] and Pallister, individually, filed objections to the proposed settlement.

¶20 On September 27, 2010, a Settlement Fairness Hearing was conducted in the District Court. The following parties attended this hearing: Smith, Speare and class counsel, BCBSMT and MCHA attorneys, Pallister's counsel, Budd's counsel, Normandeau's attorney and Fortune's attorney. Immediately prior to the hearing, BCBSMT filed a supplemental exhibit referencing, among other things, notice procedures, identification of class members, and the total amount of claims submitted on behalf of those insureds that were not paid as a result of the policy exclusions. Class counsel also submitted his time sheets to the court stating his intention to have a witness testify to the propriety of the time records.

¶21 Counsel for Pallister and Fortune moved to continue the hearing to allow them the opportunity to study these newly-submitted documents. Counsel explained that they had specifically requested this information when seeking discovery, but the court had denied their discovery motion and BCBSMT/MCHA had refused to provide it. The District Court, with some qualification, denied the motion to continue and allowed the Fairness

---

[8] Laura Fortune, though not listed consistently in the caption of the case before us, received notice of the class action proceeding because she met the "class member" definition in the proposed Settlement Agreement. She thereafter filed a written objection to the proposed settlement. Fortune was represented by counsel in the District Court and before this Court on appeal.

Hearing to proceed. The court invited the objectors to respond in writing to the newly-submitted information. Pallister subsequently filed an objection to class counsel's fee request, but no objector requested an additional hearing on this matter.

¶22 On June 28, 2011, the District Court issued its Findings of Fact and Conclusions of Law, and on June 29, its Final Order and Judgment, approving the Settlement Agreement. On July 28, 2011, Pallister, Budd, Normandeau and Fortune appealed. The case was fully briefed and oral argument was held. We conclude, for the reasons set forth below, that the District Court abused its discretion in denying Pallister's motion to conduct discovery. Therefore, we are remanding this case to the District Court with instruction to allow discovery to be conducted into the settlement negotiations and the billing records of the class counsel, to hold another fairness hearing, and to issue new findings of facts and conclusions of law based upon the entirety of evidence received in the original proceeding and during remand proceedings.

¶23 As we begin our analysis, we note that in the case before us the proposed class was certified for settlement purposes only. This makes it distinguishable from a class action certified for purposes of litigation. A settlement class action is designed to *avoid* litigation altogether. This being so, some of the adversarial protections inherent in litigation will be absent in settlement class actions. Class counsel and defense counsel may develop an alliance designed to find common ground toward settlement. The absence of an adversarial relationship between legal representatives for the plaintiffs and the defendants sometimes prompts accusations of collusion and conflicts of interest from

11

other class members and objectors. *See Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002).

¶24 In *Reynolds*, the Seventh Circuit noted that lawyers for a class, "may, in derogation of their professional and fiduciary obligations, place their pecuniary self-interest ahead of that of the class." *Reynolds*, 288 F.3d at 279. It is for this reason that the *Reynolds* court stated that district court judges must "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions." The court further stated that it and "other courts have gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class, who is subject . . . to the high duty of care that the law requires of fiduciaries." *Reynolds*, 288 F.3d at 279-80 (citations omitted). *See Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997) ("[S]pecifications of [Rule 23]—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context. Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.").

¶25 Applicable case law and Rule 23 require that a settlement agreement in a class action proceeding must be approved by a district court judge after a determination that the settlement is "fair, adequate and reasonable," i.e., the "fairness" standard. *Neuwirth*

12

*v. Allen*,[9] 1964 U.S. Dist. LEXIS 8858 (S.D.N.Y. Feb. 3, 1964). Apropos to the case before us, several courts have held that settlement approval that takes place *before* formal class certification or appointment of class counsel requires a higher standard of fairness. In *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), the Ninth Circuit Court of Appeals stated:

> The dangers of collusion between class counsel and the defendant, as well as the need for additional protections when the settlement is not negotiated by a court-designated class representative, weigh in favor of a more probing inquiry than may normally be required under Rule 23(e). This is the position adopted by the Third Circuit in *GM Pick-Up Litig.*, 55 F.3d at 805 ("We affirm the need for courts to be even more scrupulous than usual in approving settlements where no class has yet been formally certified."); the Second Circuit in *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2nd Cir. 1982) ("district judges who decide to employ such a procedure are bound to scrutinize the fairness of the settlement agreement with even more than the usual care"); and the Seventh Circuit in *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust*, 834 F.2d 677, 681 (7th Cir. 1987) ("*Simer* and *Weinberger* emphasize . . . that when class certification is deferred, a more careful scrutiny of the fairness of the settlement is required. We agree . . . ."). *See also Manual for Complex Litigation* § 30.45 (3rd. ed. 1995) ("Approval under Rule 23(e) of settlements involving settlement classes . . . requires closer judicial scrutiny than approval of settlements where class certification has been litigated.")[.] No circuit has held to the contrary. Because settlement class actions present unique due process concerns for absent class members, we agree with our sister circuits and adopt this standard as our own.

¶26 Generally speaking, "[a] proposed settlement agreement is entitled to a presumption of fairness where: '(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.' " *In re CertainTeed*

---

[9] *Neuwirth* appears to be the first case to announce that a class action settlement could not be approved unless the parties proposing the settlement demonstrate that the settlement is "fair, adequate, and reasonable."

*Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 484 (E.D. Pa. 2010). While these factors have usually been applied to proposed settlement agreements following litigation, the *CertainTeed* court concluded that this "presumption of fairness may attach even where a class is certified for settlement purposes only" provided the "requirement of adequate representation has been satisfied." *In re CertainTeed*, 269 F.R.D. at 484. (Internal citations omitted.)

¶27 A "presumption of fairness"—whether based upon the presence of a mediator or not—is not insurmountable and objectors to a class action settlement can play a role in overcoming it. Objectors can encourage scrutiny of a proposed settlement and identify areas that need improvement. They can provide important information regarding the fairness, adequacy, and reasonableness of the settlement terms. They can also seek discovery and access to information that can help the parties, counsel and the reviewing court determine if the agreement meets the fairness standard. *Manual for Complex Litigation, Fourth*, § 21.643.

¶28 The objectors here argue that the District Court could not adequately evaluate whether the Settlement Agreement met the fairness standard because the District Court did not allow objectors to conduct discovery into the settlement negotiations, and much of the critical information required for the fairness analysis was not presented to the District Court. Pallister alleges the settlement negotiations were conducted in secrecy and resulted in compromising the claims and defenses of many uninformed class members. Pallister sought to discover how BCBSMT and class counsel identified the class members and the rationale for the compromise of the class claims. Pallister also

14

wished to cross-examine class counsel at the Fairness Hearing pertaining to class counsel's billing records.

¶29   In denying Pallister's motions for discovery, the District Court relied, in part, upon *Hemphill v. San Diego Ass'n of Realtors*, 225 F.R.D. 616 (S.D. Cal. 2004). In *Hemphill*, a California federal court stated that objecting class members "do not have an absolute right to discovery" but rather the court "may, in its discretion, limit . . . discovery or presentation of evidence to that which may assist it in determining the fairness and adequacy of the settlement." *Hemphill*, 225 F.R.D. at 619.

¶30   Many courts have addressed a class member or objector's right to discovery. *In re Domestic Air Transp. Antitrust Litig.*, 144 F.R.D. 421, 424 (N.D. Ga. 1992), noted that objectors should be allowed "meaningful participation in the fairness hearing without unduly burdening the parties or causing an unnecessary delay." *In re General Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1084 (6th Cir. 1984), suggested that the court allow or disallow discovery based upon whether the district judge has sufficient facts before him to intelligently approve or disapprove the settlement. In *In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 418 F.3d 277 (3rd Cir. 2005), the Third Circuit, relying on decisions by various other courts, ultimately remanded the matter before it to the district court with instructions that the district court "develop fully the record and reevaluate whether an order limiting discovery is appropriate in light of its duty to 'employ the procedures that it perceives will best permit it to evaluate the fairness of the settlement.' " *Cmty. Bank*, 418 F.3d at 317 (*citing In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 563 (D.N.J. 1997)).

¶31 In its analysis, the Third Circuit noted that in *Girsh v. Jepson*, 521 F.2d 153 (3rd Cir. 1975), it had reversed and remanded a trial court's final approval of a class action settlement, explaining, *inter alia*, that the "objector . . . was not afforded an adequate opportunity to test by discovery the strengths and weaknesses of the proposed settlement." *Cmty. Bank*, 418 F.3d at 316. The court clarified, however, that *Girsh* did not "stand for the proposition that, as a general matter, objectors have an absolute right to discovery." *Cmty. Bank*, 418 F.3d at 316. The court continued that "discovery may be appropriate if lead counsel has not conducted adequate discovery or if the discovery conducted by lead counsel is not made available to objectors." *Cmty. Bank*, 418 F.3d at 316.

¶32 Lastly, in *Clark v. Am. Residential Services, LLC*, 175 Cal. App. 4th 785 (2009), the California Court of Appeals, while noting the participation of a "well-respected mediator with significant experience," reversed a trial court's approval of a class action settlement on the ground that the trial court did not have the information required for "an understanding of the amount that [was] in controversy and the realistic range of outcomes of the litigation"—information it called "a core legal issue" needed to assess whether the proposed settlement was fair and reasonable. *Clark*, 175 Cal. App. 4th at 801, 807. Relying on *Kullar v. Foot Locker Retail, Inc.,* 168 Cal. App. 4th 116 (2008), the court observed that

> *in the final analysis it is the court that bears the responsibility to ensure that the recovery represents a reasonable compromise, given the magnitude and apparent merit of the claims being released, discounted by the risks and expenses of attempting to establish and collect on those claims by pursuing the litigation.* "The court has a fiduciary responsibility as

16

> guardians of the rights of the absentee class members when deciding whether to approve a settlement agreement."

*Clark*, 175 Cal. App. 4th at 800 (citing *Kullar*, 168 Cal. App. 4th at 129) (emphasis in original).

¶33 The objectors argue that without the benefit of the discovery they sought, the District Court simply did not have the information necessary to make an informed judgment regarding, among other things, the identity of class members and the suitability of the compromise of the members' claims; therefore, its determination of fairness was uninformed and potentially flawed.

¶34 On the basis of the authorities cited herein and the unique progression of these proceedings, we are constrained to agree with the objectors. The record here reveals that the objectors' efforts to obtain information about negotiations and the underlying settlement were stymied at every critical turn. The court denied them the right to intervene and denied their request to conduct discovery. The court issued a protective order precluding the dissemination of any settlement information. Thus, the court's conclusion in its order denying the request for discovery that Pallister had failed to show independent evidence of unfairness begs the question of just how such evidence could be obtained in such a closed proceeding. Moreover, the submission by BCBSMT of affidavits and disclosures of the nature and amount of the settlement claims *on the morning of the Fairness Hearing*—the very information which the objectors had long sought—effectively denied the objectors any reasonable opportunity to digest and analyze the information. The last minute production of this information also arguably

impaired the court's ability to determine in a comprehensive manner whether the settlement was "fair, reasonable and adequate."

¶35    We emphasize that in reaching this decision, we are not inferring or even suggesting that there was collusion or misconduct of any sort among the parties and their attorneys. Rather, we are simply concluding that in a settlement only class action case—a matter of first impression for this Court—the heightened scrutiny required in such an action mandates that there be sufficient information provided to the class representatives, any objectors, and the district court to enable the parties and the court to reach a well-informed decision of whether the proposed settlement is fair, adequate and reasonable.

¶36    On remand, the court shall allow the objectors the opportunity to conduct limited discovery. They should be allowed to explore how the class was chosen, how the medical coding was conducted, and how and why the particular compromises of claims were determined. They should also be allowed to explore how the Settlement Agreement and class counsel's fee were negotiated, and any other area of inquiry the objectors and the court conclude is relevant. The District Court may set parameters on how and under what time frame this will be accomplished. Upon completion of this discovery and assuming the negotiation of the same or a different settlement, the District Court shall then conduct another fairness hearing and make a determination of whether the proposed settlement is "fair, reasonable and adequate."

¶37    There are numerous factors district courts consider and balance in a determination of whether a class action settlement is fair, adequate and reasonable. In *Detroit v.*

18

*Grinnell Corp.*, 356 F. Supp. 1380, 1385-89 (S.D.N.Y. 1972) (affirmed in part and reversed in part on other grounds in *Detroit v. Grinnell Corp.*, 495 F.2d 448 (2nd Cir. 1974) which, in turn, was abrogated on other grounds in *Detroit v. Grinnell Corp.*, 560 F.2d 1093 (2nd Cir. 1977)), the court, reviewing decisions by several other jurisdictions, articulated nine factors to be considered when determining the fairness of a proposed settlement: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. Many courts have since relied upon the *Grinnell* factors in determining whether a trial court conducted an adequate fairness evaluation of a settlement agreement. For example, in *Girsh*, the court noted that while the district court had referred to the *Grinnell* factors in its evaluation, the court had nonetheless failed to "live up to its fiduciary responsibility, as the guardian of the rights of the absentee class members in approving the settlement based upon the inadequate record before it." *Girsh*, 521 F.2d at 157.

¶38     In *Jones v. GN Netcom, Inc.* (a/k/a *In re Bluetooth Headset Prods. Liab. Litig.*), 654 F.3d 935, 946 (9th Cir. 2011), the Ninth Circuit noted that "[t]he factors in a court's fairness assessment will naturally vary from case to case . . . ." The court then recited several factors that courts must weigh, including many of the *Grinnell* factors: (1) the

19

strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement. *See also Livingston v. Toyota Motor Sales USA*, 1995 U.S. Dist. LEXIS 21757, 22 (U.S.N.D. Ca. 1995).

¶39 The foregoing cases and others illustrate that courts have been asked to consider numerous, varied and sometimes redundant factors when reviewing settlement agreements. Here, the District Court did consider several of the *Grinnell* factors in making its fairness analysis. On remand, the District Court shall endeavor to analyze the factors set forth above in *Jones*, as well as any other factors it deems critical to the case before it.

¶40 Citing § 26-1-813, MCA, the dissent argues that our ruling "infringes upon the confidentiality that accompanies settlement negotiations and mediations." We respectfully disagree. Section 26-1-813(1), MCA, contemplates a dispute resolution process whereby a mediator "assists disputing parties to resolve their differences." The parties who participate in such a statutory process are adversaries. By contrast, the objectors' claims here are aligned with those of the class, and are indeed dependent upon the actions of the class representatives. The objectors and the class are not adversaries—

20

rather, BCBSMT is the adversary of both. It is unfortunately emblematic of this case, however, that the class consistently deemed objectors to be the adversaries. The Dissent in its analysis perpetuates this mindset.

¶41 Finally, though we do not reach the remaining issues raised by the appellants, two matters require clarification. First, we note that the District Court found that the objectors "in choosing not to opt out of the Class . . . have acquiesced in a finding that the settlement is fair and reasonable as applied to them." This is incorrect. Generally, the Rule 23(c) notice of class action notifies a prospective class member of his or her right to opt out of the class action, object to any proposed settlement, or accept the terms and conditions of the settlement and waive the right to pursue other remedies against the class defendants. In the case before us, objectors had the right to object to the proposed Settlement Agreement and yet remain in the class. It bears noting that objectors could not have intelligently exercised their "opt out" rights without the benefit of some of the critical information they sought in discovery. Objectors did not waive their right to object by failing or refusing to opt out.

¶42 Second, Fortune claims that she presented adequate proof to the District Court that she is a member of the putative class; therefore, she is entitled to object to the Settlement Agreement. The District Court determined that she lacked standing to object to the fairness of the Settlement Agreement because her excluded claims had been paid in full by BCBSMT. Fortune disputes this assertion. Because we are remanding for further discovery, Fortune shall be given the opportunity to present evidence to the District Court

21

that will establish whether or not she has been paid for her excluded claims and whether she therefore has standing.

## CONCLUSION

¶43 For the foregoing reasons, we reverse the District Court's order denying Pallister the right to conduct discovery and vacate the District Court's approval of the Settlement Agreement. We remand to the District Court for further proceedings in accordance with this Opinion.

/S/ PATRICIA COTTER

We concur:

/S/ JAMES C. NELSON
/S/ MICHAEL E WHEAT
/S/ JIM RICE

Justice Brian Morris dissents.

¶44 The Court disregards the evidence of collusion standard normally required to trigger a discovery request by an objecting party to a class action settlement. *Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142, 1148 (9th Cir. 2000). The Court instead authorizes objectors to undertake an open-ended inquiry of the motives and actions of the settlement parties that fails entirely to take into account the apparent fairness of the proposed settlement. I fear that this departure strikes a fatal blow for class-action litigation in Montana as litigants will shy away

22

from settlements that objectors can challenge, and with little or no cause, subject the settlement parties to unprecedented invasions into the details of the agreement.

Objectors' Claim for Discovery

¶45 Objectors filed a motion to conduct discovery on June 11, 2010. The apparent secrets that objectors seek to unearth involve how BCBSMT and MCHA and class counsel identified class members and the rationale for the compromise of certain potential claims by class members. Opinion, ¶ 21. Objectors also sought "copies of all discovery conducted in the case," and "all written communications" among the representative plaintiffs, class counsel, BCBSMT, and BCBSMT's counsel.

¶46 Objectors also sought the ability to depose "those participating in the proposed settlement and the negotiations for that settlement." Objectors' last request presumably would include those parties who participated in the mediation. Montana law expressly prohibits the disclosure of "all mediation-related communications, verbal or written" made during mediation absent consent or an express statutory exception. Section 26-1-813(3), MCA. Objectors' request for "all written communications" among class counsel, the class representatives, BCBSMT, and BCBSMT's counsel raises concerns over attorney-client privilege. The Court's remand elides consideration of these issues.

¶47 Courts repeatedly have made clear that objectors should be allowed to engage in discovery relating to settlement negotiations "only where the party seeking it lays a foundation by adducing from other sources evidence indicating that the settlement may be collusive." *Lobatz,* 222 F.3d at 1148. As a general matter, "a settlement should stand or fall on the adequacy of its terms." *Newby*, 394 F.3d 296, 307 (5th Cir. 2004) (citing *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981)).

23

¶48 Objectors' counsel twice assured this Court during oral argument that the objectors "never" accused class counsel of collusion with BCBSMT and MCHA. The accusation may not have been express, but it permeates the briefs and objections filed on this appeal. Rather than dirty its hands with claims of outright collusion, the objectors, with a wink and a nod, allege that BCBSMT selected class counsel as the prime candidate for a favorable settlement and that class counsel decided to "throw in" with BCBSMT and take "the deal offered to him."

¶49 In effect, objectors argue that the settlement arose from a "reverse auction" whereby the defendants, in a series of class actions, pick the most ineffectual class lawyer to negotiate a settlement with the hope that the court will approve a weak settlement that will preclude other claims against the defendant. *Reynolds*, 288 F.3d 277, 282 (7th Cir. 2002). The ineffectual lawyer under these circumstances happily sells out a class for which he could not accomplish much anyway in exchange for generous attorney's fees.

¶50 The defendants happily pay the generous attorney's fees to the ineffectual lawyer in order to reach a better bottom line—the sum of the settlement and the attorney's fees— with no regard for the allocation of the money between the money designated for the class members and the money designated for the ineffectual lawyer. *Reynolds*, 288 F.3d at 282. The court in *Reynolds* reversed a settlement negotiated during a private lunch with no outside party present under which the defendants would pay up to $4.25 million to three lawyers who did not have active cases against the class defendant—Beneficial National Bank—at the time of the settlement. *Reynolds*, 288 F.3d at 280-81. The settlement prompted the district court to enjoin a separate class action against H & R Block proceeding in a Texas court that sought disgorgement of up to $2 billion in ill-gotten gains.

¶51    The Seventh Circuit noted that the class members received no consideration for the release of H & R Block from the Texas class action. *Reynolds,* 288 F.3d at 283-84. The court reasoned that Beneficial National Bank had brought H & R Block into the settlement for the sole purpose of allowing Beneficial to cut its own expense for the settlement in half. *Reynolds*, 288 F.3d at 284. Beneficial and H & R Block agreed to divide responsibility for the $25 million settlement amount. Two years earlier, Beneficial's counsel had indicated to the district court that $25 million represented a "ballpark figure" for settlement with Beneficial alone. *Reynolds*, 288 F.3d at 283. As these circumstances indicate, the settlement "richly rewarded" class counsel for negotiations that greatly diminished the cost of the settlement to Beneficial. *Reynolds*, 288 F.3d at 284. Not surprisingly these "suspicious circumstances" stirred the Seventh Circuit to order the district court to evaluate the settlement more closely. *Reynolds*, 288 F.3d at 284-85.

¶52    None of the "suspicious circumstances" present in *Reynolds* exist here. The parties reached the settlement here through the supervision of a court-appointed mediator. Class counsel had been litigating this matter in state and federal courts for three years before the parties reached the settlement. Class counsel's fee of $600,000, or about 25 percent of the expected settlement amount of $2.37 million, represents a reasonable fee under the parties' contingent fee arrangement.

¶53    Courts rarely grant objectors the right to undertake discovery. *Lobatz,* 222 F.3d at 1148. *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1126 (7th Cir. 1979) represents one of the few decisions that has approved discovery by objectors. The record in *General Motors* established that the settlement presented to the court by the Illinois Attorney General had been negotiated without the permission of the other class counsel in violation of the court's first pretrial order. *General Motors,* 594 F.2d at 1126. The pretrial order expressly

25

prohibited the class counsel executive committee from entering into settlement negotiations without the consent of all plaintiffs' attorneys. *General Motors,* 594 F.2d at 1126.

¶54 A lawyer from the office of the Illinois Attorney General served as a member of the committee and therefore remained subject to the pretrial order's restrictions. *General Motors,* 594 F.2d at 1126. The lawyer nevertheless participated in negotiations with General Motors without the consent of other counsel. This violation of the court order prompted the Seventh Circuit to allow the objectors to undertake discovery to determine whether the negotiations may have prejudiced the interests of the class. *General Motors*, 594 F.2d at 1126. There the court was concerned about "attorney-shopping," where a person unofficially representing a plaintiff in negotiations "shops" a settlement to appease defense counsel. *General Motors*, 594 F.2d at 1125.

¶55 The Seventh Circuit in *Mars Steel Corp. v. Continental Illinois Nat'l Bank and Trust Co. of Chicago*, 834 F.2d 677, 684 (7th Cir. 1987), pointed to the settlement negotiations in violation of the court order in *General Motors* as the type of "hanky-pank" that could justify a decision to allow objectors to engage in discovery. The court denied a discovery request by the objectors, however, when they had failed to adduce evidence of collusion from other sources. *Mars Steel Corp.*, 834 F.2d at 684. The court highlighted the need to resist the "temptation to convert a settlement hearing into a full trial on the merits." *Mars Steel Corp.*, 834 F.2d at 684.

¶56 The objectors in *Hemphill v. San Diego Assn. of Realtors*, 225 F.R.D. 616, 621 (S.D. Cal. 2004), likewise relied on their unsubstantiated claim that the settlement was collusive to support their discovery request. The court in *Hemphill* rejected the claim of collusion and objectors' demand for discovery based, in part, on the fact that a court-appointed mediator supervised the settlement negotiations. *Hemphill*, 225 F.R.D. at 621. Here the District Court appointed Judge

Whelan to serve as mediator. In that capacity, Judge Whelan supervised the mediation that led to the settlement. Judge Whelan attested that the parties had negotiated in "good faith" and that the parties fully and fairly had assessed the strength and weaknesses of their respective cases. He further believed that the settlement was fair based on the strengths and weaknesses of each party's case.

¶57 The District Court cited Judge Whelan's supervision of the mediation as a factor in rejecting objectors' request for discovery. Judge Whelan participated intimately in the negotiation process. He stands in the best position to state objectively whether an agreement has been reached free of collusion. *See Newby*, 394 F.3d at 307. Courts normally afford great deference to a mediator's assessment of an arm's length negotiation. *See D'Amato v. Deutsch Bank*, 236 F.3d 78, 85 (2d Cir. 2001). Courts have afforded this deference even in the most suspect of circumstances.

¶58 For example, the court in *Newby* determined that a mediator's involvement eliminated any question of collusion despite no discovery occurring between the parties. *Newby*, 394 F.3d at 307. The objectors argued on appeal that the district court's failure to order discovery had left unexplored the possibility that the settlement had been the product of collusion. The court rejected objectors' accusation of collusion as the claim had "never, at any point in the record, been advanced with the slightest factual substantiation." *Newby*, 394 F.3d at 307. The court further distinguished the objectors' "open-ended plea for more evidence" from the "four carefully delineated interrogatories" submitted in *Girsh v. Jepson*, 521 F.2d 153, 157, 159-60 (3d Cir. 1975). Finally, the court rejected the objectors' reliance on *General Motors*, where the court raised concerns about "attorney-shopping."

27

¶59     Similarly, the court in *Rodriquez* expressed concern that an initially undisclosed six-figure incentive payment for the class representatives suggested collusion. *Rodriquez,* 563 F.3d at 960-61.   The court noted that the class representatives' failure to disclose the incentive payments to the court, and to the class, "violated the contracting representatives' fiduciary duties to the class and duty of candor to the court." *Rodriquez,* 563 F.3d at 959.  The court ultimately determined, however, that no collusion had occurred based, in large part, on the fact that the mediator had attested that "[e]ach side aggressively advocated their positions," class counsel "ha[d] as their primary goal achieving the maximum substantive relief that they could," and the parties had reached the agreement "through arm's length negotiations by counsel who were skilled and knowledgeable about the facts and law of this case." *Rodriquez,* 563 F.3d at 961. The Court fails to explain why Judge Whelan's role in supervising the settlement negotiations similarly should not weigh in favor of the settlement's validity.

¶60     For their part, objectors, "not to disparage Judge Whelan," proceeded to do just that. Objectors suggested during oral argument that Judge Whelan's role should be discounted because he owed "no fiduciary duty" to the class and that he had no power to require discovery. None of the courts in *Rodriguez*, *Hemphill*, or *Newby* discuss any fiduciary duty to protect the interests of class members, yet the courts uniformly relied on the mediator's neutral analysis and involvement in resolving the disputes "through arm's-length negotiations." *Rodriquez,* 563 F.3d at 961.  The notion that a mediator owes a fiduciary duty to one party, and not the other, raises concerns regarding the mediator's neutrality.  I similarly am unaware of any authority that suggests that a reviewing court should disregard the role of a court-appointed mediator when the mediator lacks the power to order discovery.  Nothing in *Rodriguez* (where the mediator was a retired state court judge), *Newby*, or any case cited by objectors, suggest that the mediator

28

possessed the power to order the parties to engage in discovery. A mediator, such as Judge Whelan in this case, does not serve in the same role as a special master who might be used as part of a preliminary adjudication process.

¶61 The declared public policy of Montana "encourages[s] settlement" to "avoid unnecessary litigation." *Augustine v. Simonson*, 283 Mont. 259, 266, 940 P.2d 116, 120 (citing *Holmberg v. Strong*, 272 Mont. 101, 106, 899 P.2d 1097, 1100 (1995)). We have recognized this public policy due to a settlement's ability to eliminate cost, prevent stress that accompanies litigation, and to preserve judicial resources. *Miller v. State Farm Mut. Auto Ins. Co.*, 2007 MT 85, ¶ 14, 337 Mont. 67, 155 P.3d 1278 (citing *Durden v. Hydro Flame Corp.*, 1999 MT 186, ¶ 20, 295 Mont. 318, 983 P.2d 943). Moreover, settlement frequently provides the parties with a more equitable outcome than is possible through a jury trial. *Durden*, ¶ 20 (quoting *Black v. Martin*, 88 Mont. 256, 269-70, 292 P. 577, 581 (1930)). I find it difficult to square this public policy in favor of settlement with objectors' requirement that the mediator possess the fiduciary duties of a trustee and the authority of a court to order the exchange of documents and information before allowing the parties to settle a dispute.

¶62 The court in *Hemphill* also cited the small number of objectors as another factor that supported its decision to deny discovery. Class counsel mailed 27,000 settlement notices in *Hemphill*. Nine people submitted objections and 24 others opted out of the settlement. *Hemphill*, 225 F.R.D. at 620. The fact that the objectors "represent only a small number of the thousands of class members" weighed against the discovery requests. *Hemphill*, 225 F.R.D. at 620. This lack of objectors implies that the class as a whole deems the settlement to be fair. *Rodriquez*, 563 F.3d at 967 (noting only 54 objectors out of a class of 376,301); *Hanlon v.*

29

*Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998) (noting that 99.9 percent of class members agreed to be bound).

¶63    Three members out of a class of 2,699 objected in this case.  In essence, 0.01 percent of the class raised any qualms about the settlement, and 99.99 percent opted to accept the settlement terms.  Not one single class member opted out.  The three objectors represent a "surprisingly small fraction" if the settlement sells out the class as objectors claim.  *Mars Steel*, 834 F.2d at 681 (1.5 percent of class members opted out).  These numbers suggest that the overwhelming majority of class members deemed the settlement fair.  These numbers further suggest that the overwhelming majority of class members believed that the class action would result in a better outcome than if they opted-out to pursue their own action.  *Hanlon*, 150 F.3d at 1025.  The Court fails to explain why the paucity of objectors should not weigh against discovery.

¶64    I recognize, however, that collusion may not always be evident on the face of a settlement.  Courts look too for "subtle signs that class counsel allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth Headset Products Liability Litigation*, 654 F.2d 935, 947 (9th Cir. 2011).  *In re Bluetooth* identified three of these "subtle signs" of collusion.  First, courts should look to whether class counsel received a disproportionate distribution of the settlement.  *In re Bluetooth*, 654 F.3d at 947.  Second, courts should be wary of a "clear sailing" arrangement that provides for the payment of attorney's fees separate and apart from class funds.  This arrangement carries the potential of "enabling a defendant to pay class counsel excessive fees and costs in exchange for class counsel accepting an unfair settlement on behalf of the class." *In re Bluetooth*, 654 F.3d at 947 (quoting *Lobatz*, 222 F.3d at 1148).  And finally, courts should consider whether the parties have arranged for fees

not awarded to revert to the defendants rather than be added to the class fund. *In re Bluetooth*, 654 F.3d at 947.

¶65     Class counsel in *In re Bluetooth* received up to $800,000 compared to $100,000 for the class in cy pres awards to be distributed to four separate non-profit groups dedicated to the prevention of hearing loss. *In re Bluetooth*, 654 F.3d at 947. The class members themselves received no money at all. Here the class members would receive $2.37 million. The final amount remains to be determined, but the settlement puts no firm cap on the amount of class recovery. Class counsel would receive $600,000 in fees and costs, derived from a separate fund, under the settlement. Class members originally retained class counsel to represent them on a contingent fee basis of one-third of any recovery. The District Court noted that class counsel's fee request falls below the normal range of 33 percent to 40 percent charged by counsel in individual cases. Class counsel's fee award strikes me in no way as "disproportionate" under these circumstances.

¶66     Any notion that class counsel in this case negotiated a "clear sailing" provision regarding his fees proves unavailing here. The court in *In re Bluetooth* explained that these "clear sailing" provisions raise concerns where the defendant pays class counsel an excessive fee compared to the settlement amount to be received by the class. *In re Bluetooth*, 654 F.3d at 947. Class counsel's fee of $600,000 equates to about 25 percent of the settlement amount. The fee raises no concerns of a sell-out of the class members' interest. Finally, the settlement negotiated in this case contained no reversion provision. The settlement expressly provides that class counsel can pursue claims not previously submitted by class members on a contingent fee basis.

¶67     Objectors also seek to cross-examine class counsel regarding class counsel's billing records. This request presumably would attempt to demonstrate that class counsel had served as

a patsy who sold out the interest of the class members in exchange for an unreasonable fee. This line of attack suffers from two fatal flaws. First, class counsel obtained a settlement for the class members of up to $2.37 million in cash in exchange for a fee derived from a separate fund, which equals approximately 25 percent of the settlement amount. The District Court correctly deemed this fee to be reasonable. Objectors point to no authority that would classify this fee award as "disproportionate." *In re Bluetooth*, 654 F.3d at 947. Second, and more importantly, class counsel did not arrive on the scene in the nick of time to sell-out the class members. Unlike the previously client-less lawyers in *Reynolds*, class counsel had been litigating this matter in state and federal court for more than three years on behalf of numerous individual clients. Class counsel also had fought unsuccessfully to certify a class in federal court. Objectors opposed these class certification efforts.

¶68 The Court insists that it too is "not inferring or even suggesting that there was collusion or misconduct of any sort among the parties or their attorneys." Opinion, ¶ 35. I cannot agree. As a general principle, "the courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered." Herbert Newberg, *Newberg on Class Actions* § 11.51 at 158-59 (4th ed. 2002). Objectors have offered no direct evidence of collusion or misconduct. The Court addresses only tangentially the requirement that an objector demonstrate evidence of collusion from other sources before the objector may engage in discovery. *Lobatz*, 222 F.3d at 1148; *Hemphill*, 225 F.R.D. at 621-22.

¶69 The Court reasons that the requirement for an objector to demonstrate evidence of collusion from other sources "begs the question of just how such evidence could be obtained in a closed proceeding." Opinion, ¶ 34. I am aware of no cases, however, in which the settlement negotiations have been open to all comers. Nothing in *Lobatz* indicates anything other than a

closed proceeding produced the settlement. *Lobatz*, 222 F.3d at 1148. The same holds true for the settlement negotiations in *Mars Steel*, 834 F.2d at 681, and *Hanlon*, 150 F.3d at 1018. The Manual for Complex Litigation, Fourth, § 21.643, similarly provides that a court "should not allow discovery into the settlement negotiation process unless the objector makes a preliminary showing of collusion or other improper behavior." The Court seemingly disregards this evidence of collusion requirement in favor of some open-ended discovery requirement regardless of the appearance of an objectively fair settlement.

¶70 The Court's open-ended discovery requirement whenever an objector raises directly or implicitly a claim of collusion will likely have a chilling effect on future class action cases. The objectors' newly propounded right to discovery infringes upon the confidentiality that accompanies settlement negotiations and mediations. Section 26-1-813(3), MCA. Confidentiality fosters honest communication between parties, and in turn, this honest communication effectuates settlement. M. R. Evid. 408, Commission Comments. The Court's newly propounded rule strips the ability of parties to a class action to protect such confidential communication. This potential public scrutiny likely will lead class-action parties to be less forthcoming in negotiations, and in turn, leave the parties less likely to settle their dispute. This outcome conflicts with Montana's public policy of promoting settlements. *Miller,* ¶ 14.

Other Factors for the Court to Consider

¶71 The Court purports to rely upon the multi-factor test set forth in *Hanlon* to justify its remand to allow further discovery. Opinion, ¶ 25. *Hanlon* approved a nationwide class settlement under facts much less favorable than those presented to the District Court here. *Hanlon* involved a consolidated nationwide class action against Chrysler Corporation in which the plaintiffs alleged defects with the rear safety latches in certain models of Chrysler minivans.

*Hanlon*, 150 F.3d at 1018. The parties submitted a proposed settlement to the court three days after filing the case. *Hanlon*, 150 F.3d at 1018.

¶72 The settlement required Chrysler Corporation to correct the defect and replace the latches on class members' vans. The class members received no cash compensation. The settlement excluded personal injury claims that arose from the defective latches. Class counsel received $5.2 million in fees and costs. The court recognized that settlement represents "the offspring of compromise." In this regard, the court declined to address whether the final settlement "could be prettier, smarter or snazzier . . . ." *Hanlon*, 150 F.3d at 1027. The court instead focused on whether the settlement "is fair, adequate and free from collusion." *Hanlon*, 150 F.3d at 1027. The fact that 99 percent of the class willingly approved the offer and stayed in the class "presents at least some objective positive commentary as to its fairness." *Hanlon*, 150 F.3d at 1027. *Hanlon's* admonition that a district court's final determination to approve a class settlement should be reversed "only upon a strong showing that the district court's decision was a clear abuse of discretion," *Hanlon*, 150 F.3d at 1018, apparently sets the framework for the Court's analysis. Opinion, ¶ 25.

Extent of Discovery between Class Counsel and BCBSMT

¶73 Objectors allege that class counsel reached the settlement with BCBSMT without conducting any discovery. The court in *Newby* noted that the "overriding theme of our caselaw" discourages formal discovery in class settlements where "the interests of the class are not prejudiced by the settlement negotiations and there are substantial factual bases on which to premise settlement." *Newby*, 394 F.3d at 306. More importantly, the objectors' claim conflicts with the District Court's extensive findings of fact regarding discovery undertaken by the parties when this matter rested in federal court.

¶74 The District Court noted that parties previously had litigated the class action in federal court. Federal R. Civ. P. 26(a) accordingly required the parties to make extensive pre-trial disclosures. These disclosures produced "thousands of documents relating to class claims, individual claims of Plaintiffs and the defenses. . . ." The District Court further noted that the disclosures provided class counsel with the number of class members and the amount of coverage excluded by BCBSMT. It determined that any further discovery would have been redundant, and would have "substantially increased the related costs, thereby reducing the ultimate recovery of Class Members."

¶75 To support its decision to allow objectors to undertake discovery, the Court relies, in large part, on the fact that BCBSMT submitted "affidavits and disclosures of the nature and the amount of the settlement claims *on the morning of the Fairness Hearing*." Opinion, ¶ 34 (emphasis in original). BCBSMT admittedly submitted affidavits and disclosures to the District Court on the morning of the Fairness Hearing. These affidavits and disclosures, however, constituted little new information.

¶76 The first of these materials, Exhibit A, listed all of the class members and replicated the materials previously produced by BCBSMT on January 25, 2010. The original list of class members produced by BCBSMT on January 25, 2010, included the *Diaz* class members. *See Diaz v. Blue Cross and Blue Shield of Montana,* 2011 MT 322, ¶ 1, 363 Mont. 151, 267 P.3d 756. BCBSMT had hoped to include the *Diaz* class members in the settlement. The *Diaz* class members are proceeding, of course, with their own separate class action against the State of Montana. *Diaz*, ¶ 49.

¶77 BCBSMT recognized by the time of the Fairness Hearing that it could not include the *Diaz* class members in the settlement and thus revised Exhibit A to exclude them. Objectors

sought a continuance at the Fairness Hearing on the basis that they needed more time to evaluate why Exhibit A had been amended. Objectors seemed to concede at oral argument, however, that BCBSMT was correct to remove the *Diaz* class members from Exhibit A. In any event, objectors never at oral argument pointed to any substantive changes to Exhibit A that would support rejection of the class settlement. They simply continued to argue that the last minute modification and disclosure of the amended Exhibit A supported rejection of the settlement.

¶78 Class counsel also filed on the morning of the Fairness Hearing time sheets that reflected the hours that he had worked on the case. These records reflect 2,156.75 hours. Objectors challenge the legitimacy of these hours. Objectors raise several alleged discrepancies in the time sheets in their briefs on appeal. I will not attempt to refute these challenges. I will point instead to the fact that class counsel's fee of $600,000 compares favorably with the expected $2.37 million payout to class members. I will further point to the fact that the District Court found that payment of class counsel's fees by BCBSMT represents "a benefit provided to Class Members obtained by Class Counsel."

¶79 Finally, BCBSMT and class counsel submitted a joint report on class notice ("Joint Report") on the morning of the Fairness Hearing. This 11-page document, along with attached affidavits of four BCBSMT employees, explains the process by which BCBSMT provided notice to potential class members. BCBSMT developed a process "to identify the best manner and method to query the computer system to run a report which would result in a list consistent with the class definition." To this broad query, BCBSMT attempted to narrow the list "only to those claims to which the settlement exclusion was applied."

¶80 BCBSMT processed more than 750,000 claim lines per month during the subject period. This fact alone would make it difficult to ensure complete accuracy of the class members.

36

BCBSMT undertook further steps to review the list generated through the computer queries to ensure the accuracy of the list, including review by staff. BCBSMT then sent notice of the proposed class-action settlement to class members and established a class-action website that housed all of the pertinent information.

¶81 Objectors sought a continuance at the time of the Fairness Hearing to evaluate the methodology by which BCBSMT identified potential class members. On appeal, objectors pointed to few specific defects or flaws in the methodology used by BCBSMT other than the fact that BCBSMT failed to include Budd as a class member. Budd appeared at the Fairness Hearing. He sought to highlight his experience as evidence of the perceived flaws in the class settlement's identification of potential class members.

¶82 Budd had been involved in an automobile accident with a third-party tortfeasor. Budd alleged that BCBSMT initially had refused to pay his medical bills until he produced documentation that the tortfeasor's insurer had declined to pay them. Budd admitted at the Fairness Hearing, however, that BCBSMT eventually had paid in full the medical bills submitted by Budd's health care providers upon Budd's filing of an action against BCBSMT. Budd's omission from the prospective class, therefore, should have come as no surprise. As a result, the District Court previously had concluded that Budd was not a potential class member at the time of the settlement based upon BCBSMT's payment of all of his medical bills.

¶83 Moreover, objectors could have obtained much of the materials outlined in the Joint Report simply by filing in their own cases against BCBSMT in federal court their preliminary disclosures pursuant to F. R. Civ. P. 26(a). Objectors' filing of these disclosures would have triggered their right to propound discovery requests to BCBSMT. BCBSMT previously had filed its preliminary disclosures in federal court in the separate cases brought by objectors. Objectors

opted not to file the preliminary disclosures before the time that the federal court remanded these cases to state court.

¶84    This decision highlights the fact that class counsel, objectors, and BCBSMT had litigated this matter in state and federal court for nearly three years. This protracted litigation likely familiarized all parties with the nature of the claims, the value of these potential claims, and the approximate size of the potential class. In light of the volume of claims data and the complexity of ascertaining class-specific information from it, I have to agree with the District Court that efforts to refine these figures through further discovery would have "substantially increased the related costs, thereby reducing the ultimate recovery of Class Members."

¶85    I take a moment to address one further claim by objectors that the class settlement fails to identify all eligible class members. Objectors point to Budd's exclusion from the prospective class as evidence that the proposed settlement likely excludes eligible claimants. Based on the complexity and volume of claims data from which the parties worked, I do not doubt that the proposed settlement class might exclude some eligible claimants. The proposed settlement contains a mechanism, however, to address this problem.

¶86    The settlement provides class counsel with the authority to file unsubmitted claims on behalf of eligible class members even after the court approves it. As found by the District Court, class counsel likely will further publish the settlement in light of the fact that the settlement provides class counsel with a contingency fee interest in these unsubmitted claims. This provision undermines any objection that the proposed settlement fails to identify all eligible class members and deprives these unidentified class members the right to benefit from the settlement.

Range of Reasonableness

¶87    The fairness of a settlement remains the most pertinent factor in evaluating whether the

settlement amount falls within the range of reasonableness in light of all the attendant risks of recovery. *See Carson v. Am. Brands*, 450 U.S. 79, 88 n. 14 (1981); *UAW v. GMC*, 497 F.3d 615, 631 (6th Cir. 2007). A court should assess the reasonableness of a proposed settlement by comparing "the present value of the damages plaintiffs would likely recover if successful [at trial], appropriately discounted for the risk of not prevailing . . . with the amount of the proposed settlement." *Krell v. Prudential Ins. Co. of Am.*, 148 F.3d 283, 322 (3rd Cir. 1998). Moreover, a court in conducting this analysis must "guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *In re GMC Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 806 (3rd Cir. 1995).

¶88     The Third Circuit took this advice to heart in *Sullivan v. De Beers*, 667 F.3d 273 (3rd Cir. 2011), when it approved a class settlement of an alleged overcharging scheme undertaken by De Beers, the holder of the "undisputed position as the dominant participant in the wholesale market for gem-quality diamonds throughout much of the twentieth century." The proposed class settlement represented about 20 percent of the potentially recoverable single damages. *Sullivan*, 667 F.3d at 324. The court rejected the objectors' argument that it should have evaluated the reasonableness of the settlement based upon the potential treble damages available to the class. Among other matters, the court noted that many of the state law claims asserted would not have provided for treble recovery. *Sullivan*, 667 F.3d at 325.

¶89     The Court cites two California cases, *Clark* and *Kullar*, that involve wage and hour claims to support its determination that the District Court lacked sufficient information to evaluate the settlement's fairness. Opinion, ¶ 32. The court in *Clark* rejected a settlement that compensated the class members for "for only about 1 percent of the total value of their claims."

*Clark*, 175 Cal. App. 4th at 790. The court undertook "no independent assessment" of the strength of the class's claim and instead "simply accepted class counsel's conclusion" that the overtime claim had "absolutely no" value in what the objectors characterized as a "staggering mistake of law." *Clark,* 175 Cal. App. 4th at 803. *Kullar* too recognized that "the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement" represents the most important factor in evaluating the fairness of a settlement. *Kullar*, 168 Cal. App. 4th at 130. *Kullar* cautioned that the court "must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Kullar*, 168 Cal. App. 4th at 130.

¶90 The District Court's analysis here stands in marked contrast to the "rubber-stamp approval" rejected in *Kullar*. *Kullar*, 168 Cal. App. 4th at 130 (citing Newberg, *Newberg on Class Actions* at § 11:41). The settlement provided all class members with 50 to 75 percent of their denied medical bills depending on when they filed their claim. These medical bills typically would have been subject to co-payments and deductibles that would have reduced the amount of insurance coverage available. BCBSMT waived these coverage offsets in order to reach a settlement. The District Court found that BCBSMT's concession on the deductible's provision alone produced an extra $1,349,500 for the class when applied to an average deductible of $500 for every class member.

¶91 The District Court's order includes a finding that some class members would receive more than they otherwise would have been entitled under their insurance policies if BCBSMT applied the co-payment and deductible provisions of the class members' policies. For example, BCBSMT agreed to pay slightly more for those class members whose insurance policies provided for deductibles of $500 and co-payment obligations of 20 percent. BCBSMT agreed to

40

pay substantially more for those class members whose insurance policies provided for deductibles of more than $500 and co-payment obligations of 20 percent.

¶92    BCBSMT next waived its right to assert a time bar to the class members' claims. For example, ERISA requires a claimant to exhaust administrative remedies before the claimant may pursue a court action. *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 626 (9th Cir. 2008). A typical ERISA claimant must make an administrative appeal of his denied claim within the time period prescribed by the insurer—usually 180 days. *Vaught*, 546 F.3d at 626. Some class members with ERISA claims likely had failed to exhaust their remedies. As a result, the proposed settlement may provide these ERISA class members with the only recovery that they could obtain.

¶93    BCBSMT also possessed subrogation rights against some class members that would have reduced recovery. BCBSMT waived too these potential subrogation rights in order to achieve a settlement. It must be kept in mind that each class member already has received payment from a tortfeasor for their medical bills. BCBSMT's payment potentially would duplicate this payment for medical bills from the tortfeasor. BCBSMT would have retained the right to conduct a subrogation analysis.

¶94    The facts support the legitimacy of BCBSMT's potential right to subrogation against some class members. The average class member presented a claim of $1,580.30 for medical expenses. Montana law requires a driver to maintain a minimum liability policy of $25,000 for personal injury and $10,000 for injury to property. Section 61-6-103, MCA. This fact left more than $33,000 available from the tortfeasor's liability policy to cover non-medical damages, such as lost wages, pain and suffering, and damage to the class member's vehicle. Some class members may have been made whole in the process.

¶95    At a minimum, BCBSMT would have been required to conduct an individualized assessment to determine whether each class member had been made whole. This analysis would have required that the parties first establish the class member's total damages, including the costs and attorney's fees to recover these damages. The parties then would have had to establish whether the claimant has recovered that total amount from the tortfeasor. If the class member has not recovered the full amount of damages, including costs and attorney's fees, the parties would have needed to assess how much Blue Cross had to pay to satisfy the difference between the class member's recovery from the tortfeasor and the class members' total damages. This fact intensive, individualized inquiry likely would have reduced the recoveries of some class members.

¶96    Objectors further have raised the specter of squandered interest by class counsel in attacking the amount of the settlement. Objectors claimed at the fairness hearing that the prejudgment interest due to the class amounted to approximately $3.7 million. Similarly, objectors noted that BCBSMT's total liability under the settlement is "likely less than just the prejudgment interest BCBSMT should pay on the benefits withheld." Numerous erroneous assumptions underlie these claims.

¶97    First, the objectors reach these inflated amounts using the number of class members from the original projected class—3,585. This original projected class, produced by BCBSMT on January 25, 2010, included state employees from the *Diaz* class. These *Diaz* class members are no longer class members, so the number of class members and unpaid claims has decreased dramatically. BCBSMT filed an amended class list on September 27, 2010, the amended Exhibit A, at the Fairness Hearing. The amended class, as reflected in Exhibit A, contains 2,699

members.  Objectors need to modify their claims of prejudgment interest to reflect a decrease of nearly 1,000 class members from the original list.

¶98	Objectors also seem to have miscalculated the interest that may have accrued on any ERISA claims in reaching their claim of $3.7 million in lost interest.  A district court possesses discretion to award prejudgment interest on an award of ERISA benefits.  *Blankenship v. Liberty Life Assur. Co.*, 486 F.3d 620, 627-28 (9th Cir. 2007).  Objectors appear to assume that any interest due to ERISA members under this standard will be calculated at the Montana statutory rate of 10 percent.  Courts generally use, however, "the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961" to fix the rate of pre-judgment interest for ERISA claims.  *Nelson v. EG & G Energy Measurements Group, Inc.*, 37 F.3d 1384, 1391 (9th Cir. 1994).  The statute prescribes that interest be set "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding."  28 U.S.C. § 1961.  The current Treasury bill yield stands at 0.18 percent.  Federal Reserve, *Selected Interest Rates (Daily)*, http://www.federalreserve.gov/releases/H15/update (last accessed August 27, 2012).

¶99	These rates admittedly have been higher during the period at issue in this case, but the rates have fallen far below 10 percent.  Nevertheless, application of the appropriate Treasury bill yield to the class members' claims premised on ERISA violations would result in much lower amounts of prejudgment interest.  For example, application of the annual Treasury bill yield to the claims of the roughly 2100 ERISA class members would result in approximately $547,380.56 in prejudgment interest.  This total represents an average interest award of about $260 for each ERISA class member.

43

¶100 The significantly smaller non-ERISA class—572 class members—would be much less likely to recover prejudgment interest if their cases proceeded individually. A party may recover prejudgment interest under Montana law under the following circumstances: (1) the person must be "entitled to recover damages certain or capable of being made certain by calculation. . . " and (2) "the right to recover that [sum certain] is vested in the person on a particular day. . . ." Section 27-1-211, MCA. Serious questions exist as to whether the non-ERISA class members could satisfy either the liquidated requirement or the undisputed requirement. See § 27-1-211, MCA; *Baltrusch v. Baltrusch*, 2003 MT 357, ¶ 67, 319 Mont. 23, 83 P.3d 256.

¶101 With respect to the liquidated requirement, it would appear that the amount owed to each class member would remain uncertain until BCBSMT had completed a made- whole analysis. As discussed previously, BCBSMT would have been entitled to pursue a subrogation action against any class member who had been made whole through the payment from the tortfeasor. The fact intensive, individualized inquiry of the made- whole analysis likely would require adjudication in many cases. These factors weigh heavily against the notion that the amount owed by BCBSMT to each class member easily could have been liquidated.

¶102 Similarly, difficult questions accompany the notion of whether the class members' right to prejudgment interest vested on the day that they filed their claims. Objectors' argument rests entirely on the alleged unlawfulness of BCBSMT's policies in effect at the time of the class members' accidents. They point to this Court's decision in *Blue Cross Blue Shield of Montana, Inc., v. Montana State Auditor*, 2009 MT 318, 352 Mont. 423, 218 P.3d 475. We determined in *State Auditor* that the Commissioner properly had rejected insurance forms submitted by BCBSMT on the basis that the offset language in the insurance forms conflicted with §§ 33-30-1101 and -1102, MCA. *State Auditor*, ¶ 19.

44

¶103 The Commissioner, of course, had allowed BCBSMT to use these same forms from March 2002 through March of 2008. BCBSMT's use of these forms during this six year period undisputedly spawned this litigation and the litigation in *Diaz* and *Shattuck*. A dispute remains, however, when the class members' claims accrued based upon BCBSMT's use of these insurance forms. The Commissioner allowed BCBSMT to include the offset in its insurance policies until March 2008. The District Court upheld the Commissioner's decision in December 2008 and we affirmed that decision in 2009. Blue Cross's liability for denying claims based on the offset contained in the insurance forms arguably did not become apparent until at least 2008. This determination would limit eligible class members to only a few years of prejudgment interest.

¶104 Objectors' claim of $3.7 million in prejudgment interest also fails to take into account the fact that many of the class members' claims would have been time barred if not for BCBSMT's concession. Class counsel's decision to forego an indeterminate amount of prejudgment interest in exchange for these trade-offs, especially BCBSMT's waiver of its potential exhaustion defense and co-payments and deductibles requirement, looks more reasonable when viewed in light of the full terms of the settlement.

Risk of Maintaining Class Action Status

¶105 The remaining factors weigh heavily in favor of upholding the settlement. The class faced the risk of whether it could obtain class certification. *Rodriquez,* 563 F.3d at 966; *D'Amato*, 236 F.3d at 86. The class faced a substantial risk, at the time of settlement, that they would not be able to certify the class. The district court judge in *Diaz*, being litigated contemporaneous with this case, had declined to certify a class comprised of members in circumstances nearly identical to those here. *Diaz,* ¶ 6. The District Court similarly signaled

45

concerns with class certification. The District Court noted that BCBSMT had waived multiple defenses that would have posed a "very substantial barrier" to class certification. The District Court stated that it "does not see how the Class could have been properly certified over [BCBSMT's] objections." This clear risk to class certification undoubtedly weighed in the settlement negotiations.

The Risk, Expense, Complexity, and Likely Duration of Further Litigation

¶106   The risk for prolonged litigation and appeals also loomed. *Rodriquez,* 563 F.3d at 966; *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1188 (10th Cir. 2002). This factor recognizes that settlement in itself weighs in favor of fairness because settlement possesses inherent benefits. For example, class members possess an interest in a settlement check today versus a settlement several years from now. *Rodriquez,* 563 F.3d at 966; *Rutter & Wilbanks Corp.* 314 F.3d at 1188. Litigation and appeals substantially increase costs, which in turn, may reduce overall recovery for the class. *Rodriquez,* 563 F.3d at 966; *See Mars Steel*, 834 F.2d at 682.

¶107   It must be noted in this regard that the class representatives stood more inclined than class counsel to buy their peace and settle the class action. Judge Whelan stated in his mediation report that class representatives were more risk-averse than class counsel and were more inclined to accept the settlement. Not surprisingly, objectors do not allege that these class representatives participated in collusion in light of the token incentive payment of $2,500 that each class representative would receive under the settlement. The class representatives valued an immediate, risk-free and stress-free settlement against the gamble of a potentially larger judgment that could only occur after prolonged and expensive litigation.

Conclusion

¶108 Assessing the fairness of a proposed class-action settlement requires a court to evaluate numerous well-established factors. *Hanlon*, 150 F.3d at 1026; *Sullivan*, 667 F.3d at 319-20. The Court recognizes the factors that it should consider, but fails to analyze these factors in the context of this settlement and fails to apply them to the facts presented here. Opinion, ¶ 37. The Court instead isolates the reaction of a few class members to the proposed settlement and, based largely upon speculation, remands the class settlement for further delay and expense to an uncertain end. In doing so, the Court ignores the well-settled requirement that an objector must provide some evidence suggesting collusion or misconduct in order to be entitled to undertake discovery of the class settlement negotiations. The Court's imposition of what amounts to some sort of arbitrary "smell test" on the validity of a class settlement casts a dark pall upon the legitimacy of future class certifications that may come before this Court. *See, e.g.*, *Diaz*. Today's outcome produces few winners. Without doubt, however, today's outcome resounds to the detriment of the class members. I dissent.

/S/ BRIAN MORRIS

Chief Justice Mike McGrath joins in the foregoing dissent.

/S/ MIKE McGRATH

Justice Beth Baker joins in the foregoing dissent.

/S/ BETH BAKER